**NATIONAL LABOR RELATIONS BOARD, Plaintiff,**

v.

**COMMITTEE OF INTERNS AND RESIDENTS, and the New York State Labor Relations Board, Defendants.**

**No. 76 Civ. 5119.**

United States District Court, S. D. New York.

Jan. 31, 1977.

**440**

Carl Taylor, Assoc. Gen. Counsel, Washington, D. C., Edwin H. Bennett, Regional Atty., New York City, for plaintiff N.L.R.B.

Murray A. Gordon, Mark Kreitman, New York City, for defendant Committee of Interns and Residents.

Norbert M. Phillipps, Gen. Counsel, New York City, for defendant New York State Labor Relations Bd.

Gerald A. Bodner, Mark A. Chertok, New York City, for Albert Einstein College of Medicine, amicus curiae.

Carl W. Vogt, Jay Counts, Fulbright & Jaworski, Washington, D. C., for Assn. of American Medical Colleges, amicus curiae.

## MEMORANDUM

STEWART, District Judge:

Plaintiff National Labor Relations Board ("NLRB" or "the Board") has brought this action in federal court seeking to enjoin defendant Committee of Interns and Residents ("CIR") from attempting to require co-defendant New York State Labor Relations Board ("SLRB") to assert jurisdiction over any of the unfair labor practice charges and the representation petition filed by the CIR against various voluntary, non-profit hospitals in the New York City area. The CIR is a labor organization whose members are physicians working in training programs as interns, residents and clinical fellows ("housestaff") in these hospitals. Plaintiff also seeks to enjoin defendant SLRB from considering, or in any way asserting jurisdiction over, these labor disputes. Plaintiff seeks this relief on the ground that this area of labor relations has been preempted by the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. ("NLRA" or "the Act") and is within the exclusive jurisdiction of the NLRB. Plaintiff also seeks a declaratory judgment that these matters are preempted by the aforementioned federal statute.

Defendant CIR has cross-moved for summary judgment alleging that this court lacks jurisdiction over the subject matter of this action and that, on the merits, the NLRA has not preempted this area of labor relations. Defendant SLRB has taken no position, but has informed the Court that it will comply with the judgment of this Court or any other court of competent jurisdiction.[1]

### Factual Background

The question presented by this action is whether housestaff physicians, working and training in voluntary non-profit hospitals in New York State, may be covered under the New York State Labor Relations Act, Labor Law § 700 et seq. (McKinney's 1965) ("SLRA"), or whether they are covered exclusively by the NLRA.

Section 701(12) of the Labor Law extends the coverage of the SLRA to "any person

---

1. Albert Einstein College of Medicine and Misericordia Hospital Medical Center moved to intervene as plaintiffs under Rule 24(b) of the Federal Rules of Civil Procedure. On December 13, 1976, this Court denied the motion to intervene, but granted leave for the hospitals to appear as *amici curiae*. The Court has also allowed the Association of American Medical Colleges to file a brief as *amicus curiae*.

employed or permitted to work by or at a non-profitmaking hospital or residential care center." The SLRB has interpreted this to include housestaff. *Long Island College Hospital,* 33 SLRB No. 32 (1967); *Brooklyn Eye and Ear Hospital,* 32 SLRB No. 21 (1966). For a considerable period of time, the SLRB and hospitals have recognized the CIR (as provided by § 705 of the SLRA), as the exclusive bargaining representative of housestaff physicians in a substantial number of voluntary, non-profit hospitals in the New York City area. During this time, the CIR has negotiated collective bargaining agreements on behalf of its members with these hospitals.

Prior to 1974, there was no conflict between this coverage under the SLRA and the NLRA, because the NLRA had excluded from its definition of "employer" any "corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual" (repealed 29 U.S.C. § 152(2)). However, effective August 25, 1974, Congress deleted this exclusion from § 152(2), and extended the coverage of the NLRA to any "health care institution" which is defined as

> . . . any hospital, convalescent hospital, health maintenance organization, health clinic, nursing home, extended care facility, or other institution devoted to the care of sick, infirm or aged person . . . 29 U.S.C. § 152(14).

There appears to be no dispute that this amendment brought labor relations between voluntary, non-profit hospitals and their "employees" as defined in Section 2(3) within the jurisdiction of the NLRA. This by no means, though, disposes of the question of whether housestaff physicians are within the exclusive jurisdiction of the NLRA.

The NLRB first considered the situation of housestaff in *Cedars-Sinai Medical Center,* 223 NLRB No. 57, 91 LRRM 1398

(March 19, 1976), and concluded (with Member Fanning dissenting at length) that

> . . . interns, residents, and clinical fellows, although they possess certain employee characteristics, are primarily students. Accordingly . . . we conclude that the interns, residents and clinical fellows . . . are not "employees" within the meaning of Section 2(3) of the Act. *Id.* at 3.

In light of this conclusion, the NLRB found that the Cedars-Sinai Housestaff Association, which was comprised solely of housestaff physicians, was not a labor organization within the meaning of § 152(5) of the NLRA. The NLRB then dismissed the Association's petition to certify a bargaining unit of housestaff physicians on the ground that it presented "no question affecting commerce . . . concerning the representation of 'employees' of the Employer within the meaning . . . of the Act." 223 NLRB No. 57 at 8. This view was adhered to without modification in a number of subsequent cases involving housestaff in hospitals around the country.[2]

Following this decision, Misericordia Hospital Medical Center refused to recognize or bargain with the CIR, so the CIR petitioned the SLRB for certification based on the CIR's claim that it represented a majority of the housestaff at Misericordia. In addition, other hospitals, where the CIR had been recognized and certified as the exclusive bargaining representative for housestaff, also refused to bargain with the CIR, so the CIR filed with the SLRB unfair labor practice charges against these hospitals. In all these cases, the hospitals refused to recognize or bargain with the CIR because of the NLRB's ruling in *Cedars-Sinai.* Further, the hospitals objected to the proceedings before the SLRB on the ground that the 1974 health care amendments to the NLRA had preempted state regulation of labor relations in the health care field.

---

**2.** *Wayne State University,* 226 NLRB No. 168 (1976); *Buffalo General Hospital,* 224 NLRB No. 17, 92 LRRM 1197 (1976); *St. Clare's Hospital,* 223 NLRB No. 163, 92 LRRM 1001 (1976); *University of Chicago,* 223 NLRB No. 154, 92 LRRM 1039 (1976); *St. Christopher's Hospital,* 223 NLRB No. 58, 91 LRRM 1417 (1976).

**442**

While these proceedings were pending before the SLRB, the NLRB issued its decision in *Kansas City General Hospital*, 225 NLRB No. 14 (June 24, 1976), in which it reiterated the *Cedars-Sinai* finding that housestaff physicians are not "employees" within the meaning of the NLRA, and concluded that the hospital there involved was

. . . not an "employer" within the meaning of Section 2(2) of the Act for the purposes of any disputes relating to such personnel.

In the CIR proceedings before the SLRB, the jurisdictional issue was briefed, and on July 14, 1976, the SLRB dismissed the representation petition stating:

The question of possible state jurisdiction here is certainly not free from doubt. Cogent arguments can be, and have been made on both sides of this issue. On balance, we have concluded that further processing of this matter before this Board is not warranted at this time. *Misericordia Hospital Medical Center,* 39 SLRB No. 32.

The unfair labor practice charges against the other hospitals were also dismissed for the same reason.

The CIR then commenced a number of Article 78 proceedings (New York CPLR § 7801 *et seq.* (McKinney's 1963)) in New York State Supreme Court asking the Court to vacate the SLRB's dismissals and order the SLRB to assert jurisdiction over the CIR's claims. Initially, the SLRB alone was named as defendant in these state court actions. However, a number of hospitals moved to intervene as defendants and did so by stipulation of the parties. Thereafter, the intervenors sought to remove several of the actions to federal court. Their petitions were denied on September 28, 1976 by Judge Brieant of this Court on the ground that the federal preemption question was not presented as part of the plaintiff's claim in state court, but only appeared as a defense, so there was no federal jurisdictional basis for removal. 28 U.S.C. § 1441.

Upon remand, Justice Gellinoff of the New York State Supreme Court vacated the SLRB's determinations dismissing the CIR's representation petition and unfair labor practice charges, and remanded them to the SLRB for further consideration. Justice Gellinoff concluded that, in light of 1) the NLRB's finding in *Cedars-Sinai* concerning the "employee" status of housestaff physicians, 2) its further determination in *Kansas City* that hospitals were not "employers" within the meaning of the NLRA for the purpose of disputes relating to housestaff, and 3) the absence of any language either in the NLRA or the Board's decision indicating the intention that "these vital members of the hospital's working staff should be bereft of any labor regulation at all,"

. . . the jurisdiction of respondent State Board over disputes between petitioner and the intervening hospitals is unaffected by the 1974 amendments to the National Labor Relations Act, and therefore the Board retains the same jurisdiction it previously possessed. 93 LRRM 2540 (October 14, 1976).

In response to Justice Gellinoff's decision, the NLRB *sua sponte* reconsidered and revised its opinion in *Kansas City*. In its revised order of November 8, 1976, the Board (Member Fanning dissenting) announced that it would delete the finding in its original decision that the hospital was *not* an "employer" under the NLRA for the purposes of any disputes relating to housestaff, and that it relied simply on the *Cedars-Sinai* holding that housestaff are not "employees" under the NLRA as grounds for dismissing the union's petition. The Board then directly addressed the preemption question presented in the instant case, and concluded that there was federal preemption of labor relations in the health care field. The Board stated:

Turning to the preemption question, we believe that it has now become necessary for us to state explicitly that which is, in our view, implicit in the Board's Decision in *Cedars-Sinai*; that is, at the risk of being somewhat repetitious, that the majority of this Board intended by its decision therein to find federal preemption of

the health care field to preclude States from exercising their power to regulate in this area. It is our judgment that the Congress, in passing the 1974 health care amendments, simply made a determination that residents, interns, and fellows, *inter alia*, were not supervisors within the meaning of the Act, but left the question as to whether they were "employees" entitled to collective-bargaining rights for resolution by the Board in the exercise of its discretion. Having exercised its discretion in *Cedars-Sinai*, by finding residents, interns and fellows to be primarily students and not "employees" within the meaning of the Act, the Board confirmed, in our view, that it has not put hospital residents and interns beyond the reach of national labor policy, but has rather held that to extend them collective-bargaining rights would be contrary to that very policy. 225 NLRB No. 14A at 4–5 (footnotes omitted).

This action was commenced by the NLRB on November 16, 1977. The Court has been informed that there is no other federal action pending in which the NLRB's ruling on federal preemption in *Kansas City* is directly being reviewed (Transcript of December 16, 1976 hearing pp. 55–6).

An appeal from Justice Gellinoff's decision was taken by the defendant hospitals and was pending before the New York State Supreme Court, Appellate Division, when this federal action was filed. However, in light of the Board's revised decision in *Kansas City,* several of the hospitals also moved to reargue before Justice Gellinoff. On January 6, 1977, the motion was granted and Justice Gellinoff vacated his previous decision and dismissed the CIR's petitions on the ground that he was bound by the Board's subsequent ruling on preemption. On January 20, 1977 Justice Gellinoff denied the CIR's request that he reconsider his January 6, 1977 ruling. The Court has been informed that the CIR has filed a notice of appeal from the dismissal, and that the Appellate Division has provided for an expedited briefing schedule and oral argument in early March (January 26, 1977

letter of Daniel Riesel representing *amicus* Albert Einstein College of Medicine).

*Jurisdiction*

■ The jurisdiction of this Court has been invoked under 28 U.S.C. § 1337 as the action arises under the NLRA, 29 U.S.C. § 151 *et seq.* The CIR has asserted, however, that this Court lacks subject matter jurisdiction on the grounds that 28 U.S.C. § 2283 bars this Court from granting either the injunctive or declaratory relief sought and that no exception to § 2283 is applicable here. The CIR further contends that this Court is barred by principles of federalism and equity from granting the injunctive relief sought.

First, we agree that the relief sought in this case does fall within the prohibition of § 2283 which states:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

Here, defendant CIR initiated state court proceedings, long before this case was filed, in which it sought review of the SLRB's dismissal of the CIR's representation petition and unfair labor practice charges and a determination that the SLRB did have jurisdiction over the CIR's labor disputes with the hospitals. These state court proceedings are still pending—at this point at the appellate level—where the trial court's dismissal of the CIR's petitions is under review.

The direct impact of this court issuing the injunction sought would be to restrain the CIR from continuing to assert its rights in these state court proceedings. This puts the injunctive relief sought within the strictures of § 2283. *Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 287, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970); *Oklahoma Packing Co. v. Oklahoma Gas & Electric Co.,* 309 U.S. 4, 9, 60 S.Ct. 215, 84 L.Ed. 447 (1940). Section

2283 applies as well to the declaratory relief sought. *Thiokol Chemical Corp. v. Burlington Industries,* 448 F.2d 1328 (3d Cir.) *cert. denied* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1971); *accord, Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Gajon Bar & Grill v. Kelly,* 508 F.2d 1317 (2d Cir. 1974).

There are a number of exceptions to the prohibition set forth in § 2283, three of which appear in the statute itself. None of these is urged by the parties as having application here. However, plaintiff contends that the exception developed in *NLRB v. Nash-Finch Co.,* 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971) does apply in this case. The CIR disagrees.

In *Nash-Finch,* the Supreme Court held that the NLRB had "implied authority . . . in spite of the command of § 2283, to enjoin state action where its federal power preempts the field" (404 U.S. at 144, 92 S.Ct. at 377).

In *Nash-Finch,* as here, no proceedings were pending before the Board involving the activities which the Board sought to enjoin the state court from regulating. Instead, the Board's claim there, as here, was based on its general assertion that the conduct which the state sought to regulate was governed exclusively by the NLRA. In a procedural context, then, very similar to that present here, the Supreme Court in *Nash-Finch* found that the Board had the implied authority to seek injunctive relief against preempted state action.

The CIR claims that the *Nash-Finch* exception to § 2283, however, should not apply in the instant case because here the existence of federal preemption is the heart of the controversy between the parties, while in *Nash-Finch,* according to the CIR, preemption was "posited and apparently not contested" (CIR Memorandum p. 15). While Justice Douglas, writing for the majority, did find in *Nash-Finch* that "the exclusiveness of the federal domain is clear," (404 U.S. at 147, 92 S.Ct. at 379) we do not think that the Court's holding depended on the preemption issue being un-

contested. In fact, judging from comments made by Justice White in his dissent, this issue was not uncontested (*Id.* at 154–156, 92 S.Ct. 373).

The Supreme Court's analysis in *Nash-Finch* began with its finding that the purpose of the NLRA

. . . was to obtain "uniform application" of its substantive rules and to avoid the "diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies." *Id.* at 144, 92 S.Ct. at 377.

The Court recognized the special position of the NLRB as "the sole protector of the 'national interest' " (*Id.* at 145, 92 S.Ct. at 378), as defined by the NLRA, and concluded that an exception to § 2283 existed for the NLRB when it was acting in its capacity as "protector" of the national interest, and seeking to protect federal rights and policies from improper regulation by the state. The § 2283 exception was proper under these circumstances because:

The purpose of § 2283 was to avoid unseemly conflict between the state and the federal courts where the litigants were private persons, not to hamstring the Federal Government and its agencies in the use of federal courts to protect federal rights. We can no more conclude here than in *Leiter* [*Minerals, Inc. v. United States,* 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957)] that a general statute, limiting the power of federal courts to issue injunctions, had, as its purpose the frustration of federal systems of regulation. The frustration of superior federal interests by the general language of § 2283 cannot reasonably be imputed. *Id.* at 146, 92 S.Ct. at 378. (citations omitted).

We think this rationale applies as much where federal preemption may have been conceded as where it is contested by the parties, and ultimately found by the court. Once the court determines that the Board's preemption claim is not frivolous (as it clearly is not here), it may entertain the Board's action seeking injunctive relief un-

der the *Nash-Finch* exception to § 2283's jurisdictional bar.[3]

Accordingly, we find that the exception to § 2283 articulated in *Nash-Finch* applies in the instant case, and this court has jurisdiction over the subject matter of this action.

The CIR further argues that we should decline to exercise our jurisdiction because "considerations of federalism, comity and the adequacy of state remedies mandate equitable restraint" (CIR Memorandum p. 16).

The Supreme Court has indicated that, even where there is an exception to the anti-injunction statute, the principles of equity, comity and federalism must still be considered by a federal court when asked to enjoin a state court proceeding. *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). The weight which these elements must be given when the state proceeding is criminal has been extensively analyzed by the Court in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its companion cases. Concerning the application of the *Younger* doctrine to state civil cases, Justice Stewart, concurring in *Younger*, stated:

> Courts of equity have traditionally shown greater reluctance to intervene in criminal prosecutions than in civil cases. . . The offense to state interests is likely to be less in a civil proceeding. A State's decision to classify conduct as criminal provides some indication of the importance it has ascribed to prompt and unencumbered enforcement of its law. By contrast, the State might not even be a party in a proceeding under a civil statute. 401 U.S. at 55 n.2, 91 S.Ct. at 757 (citations omitted).

In *Lynch v. Household Finance Corp.*, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), Justices White and Blackmun and Chief Justice Burger indicated, in a dissent addressing a question not reached by the majority, that they viewed the *Younger* considerations as "equally applicable where state civil litigation is in progress" (*Id.* at 561, 92 S.Ct. at 1126). However, most recently in *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), the Court, including the three dissenters in *Lynch,* specifically declined to make "general pronouncements upon the applicability of *Younger* to all civil litigation" (*Id.* at 607, 95 S.Ct. at 1209). In *Huffman*, the federal court had been asked to enjoin a pending state civil nuisance proceeding which had been brought by the state. The Supreme Court emphasized the fact that the state had brought the state court action and that that action was "both in aid of and closely related to criminal statutes" (*Id.* at 604, 95 S.Ct. at 1208). Under these circumstances, the Court concluded that to disrupt the state action would interfere with the "state's efforts to protect the very interests which underlie its criminal laws" (*Id.* at 605, 95 S.Ct. at 1208), and that the affront to the state was just as great as it would be if the state proceeding had been criminal. Thus the Court held that the principles of federalism and comity expressed in *Younger* applied and dictated that the federal court decline to exercise its jurisdiction.

In the instant case, not only is there no state criminal proceeding involved, but the pending state civil action was brought by a private party on the basis of the state labor statutes, and can in no way be considered to be either "in aid of" or "closely related to" any criminal statute. Thus we conclude

---

**3.** The concerns expressed by Justice White, dissenting in *Nash-Finch*, do not militate against this conclusion. He urged that if, contrary to his view, the Board did have power to seek an injunction to prevent state interference in activities preempted by federal law, it should not be able to obtain this relief simply by "the mere conclusory allegation that such rights are 'arguably' protected", *Id.* at 154, 92 S.Ct. at 382, but should be entitled to the relief only if it

"persuades a federal court that the state decree is actually interfering with rights protected by federal law". *Id.* at 156, 92 S.Ct. at 383. Thus even the dissent envisioned the jurisdictional doctrine expressed in *Nash-Finch* as applying where the preemption issue was not initially settled, and simply argued that the higher standard of proof was necessary in order for the court to grant the injunctive relief sought.

that the *Younger* principles, even as extended by *Huffman*, do not apply with such force in this case. *Vail v. Quinlan*, 406 F.Supp. 951 (S.D.N.Y.), *prob. juris. noted sub nom. Juidice v. Vail*, 426 U.S. 946, 96 S.Ct. 3164, 49 L.Ed.2d 1182 (1976).

■ To determine whether the principles of comity and federalism should cause us to decline to assert jurisdiction here, we must evaluate the competing state and federal interests, in light of the ground asserted in support of intervention in the state proceedings. *Perez v. Ledesma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). Here, plaintiff asserts a claim of federal preemption. Recently, a three-judge court in *Doe v. Maher*, 414 F.Supp. 1368 (D.Conn.1976), appeal docketed, 45 U.S.L.W. 3451 (December 24, 1976), analyzed the considerations of comity and federalism presented when a federal plaintiff asserts a preemption, rather than a constitutional, claim as the ground for federal intervention in state proceedings and concluded that "traditional notions of federal-state relations, rather than requiring abstention, impel this court to intervene" (*Id.* at 1374).

■ The *Maher* court indicated that, while the doctrines of comity and federalism counsel a federal court to give proper deference to the independent sovereignty of the individual states, this deference should be tempered by recognition of the particular areas of expertise of the federal and state courts. A claim of preemption requires the court to determine, in the absence of specific direction, the Congressional intent behind a particular statute. This is a task of federal statutory interpretation. Because the federal courts have primary competence in deciding questions of federal law, preemption thus presents an issue which is within the sphere of special federal judicial competence. It would be inappropriate for a federal court to decline jurisdiction in these circumstances.

The court in *Maher* also determined that the federalism interest of avoiding any interference with pending state court proceedings was not compelling where the federal injunction was based on preemption, rather than constitutional, grounds. In the case of preemption, the intrusion flowed from and expressed a Congressional determination that the area was not within state power. Thus, as the court stated:

[a] finding of preemption . . . is a finding that the intrusion has already occurred . . . it would be a finding that for reasons of national policy Congress had intended that the pending state court actions should not have been instituted. It would be a finding concerning the validity of the proceeding itself, not just concerning the constitutionality of the particular statute or its particular application. While this would clearly be an intrusion into a legitimate sphere of state interest, it would be an intrusion accomplished at the direction of Congress, and one which is clearly within Congress' power to direct. 414 F.Supp. at 1375.

■ An additional factor militates against declining jurisdiction in the instant case: here the NLRB is asserting the claim of federal preemption. We think that the same considerations which caused the Supreme Court to develop an exception to § 2283 for the federal government and its agencies in *Leiter* and *Nash-Finch*, and to conclude that for these federal entities, "access to federal courts is 'preferable in the context of healthy federal-state relations,'" (404 U.S. at 147, 92 S.Ct. at 379 citing *Leiter*, 352 U.S. at 226, 77 S.Ct. 287), support the exercise of federal jurisdiction here.

Thus we have concluded that the concerns addressed by the principles of comity and federalism weigh in favor of, not against, our exercising jurisdiction.

Nor does the CIR's assertion that plaintiff has an adequate remedy in the state courts change this balance. It would appear that the pending state proceedings offer adequate opportunity for the NLRB to raise fully its preemption claim. However, as discussed above, a finding that federal law preempts application of any state regulation amounts to a finding that the state action should not have been brought. The

NLRB is not a party to the state actions and specifically declined to join them, though invited to by the CIR (Defendant CIR's Answer, Exhibits 23 and 24). Rather than finding this choice improper, we think it would be somewhat anomalous to require the NLRB to submit to the jurisdiction of a state court when the basis of its claim is that the state does not have any jurisdiction over the subject matter.

Further, we think that the preference for a federal forum expressed in *Nash-Finch* weighs strongly against our requiring the NLRB to seek its remedy in state court. Indeed, in *Nash-Finch*, the Court did not so require. As Justice White observed (dissenting):

> Rather than allowing the union to appeal the injunction through the state court system, and to this Court if necessary, as the union would ordinarily have to do, *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers, supra*, the Court today permits the Board to short-circuit that process by securing a federal injunction, solely upon allegations that the conduct of the union was arguably protected under federal law and was within the exclusive jurisdiction of the NLRB. 404 U.S. at 154–155, 92 S.Ct. at 382.

We think here that it is neither necessary nor proper for us to require the NLRB to first litigate its preemption claim in the state courts, and we will not decline jurisdiction because of the CIR's claim that plaintiff has an adequate state court remedy.

Accordingly, we do not find that the considerations of federalism and comity or the adequacy of state remedies require that we decline to exercise our jurisdiction, and we will now consider the merits of the plaintiff's claim.

### Preemption

■ Preemption of state regulation occurs where there is a clear manifestation of Congressional intent to occupy the field and supersede the state's exercise of power. *New York Department of Social Services v.*

*Dublino*, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Schwartz v. Texas*, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231 (1952). Divining this intent from the provisions of the National Labor Relations Act has involved the courts in a considerable stream of litigation since the passage of the Act. In the course of this process of interpretation, the Supreme Court has identified a number of different factual patterns wherein federal preemption is indicated. For the purposes of this case, we have found it useful to analyse these cases by dividing them into three categories.

The first consists of cases where the Board has determined that the activity involved is protected by § 7 (Rights of Employees), or prohibited by § 8 (Unfair Labor Practices), of the Act, or where, even though the Board has not determined the status of the conduct, it may fairly be assumed to be, or is arguably subject to §§ 7 or 8. Here the Court has consistently found preemption necessary to avert the danger of state interference with national labor policy as expressed by the provisions of §§ 7 and 8. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244–245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 20 L.Ed.2d 473 (1971); *Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776*, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953); *La Crosse Telephone Corp. v. Wisconsin Employment Relations Board*, 336 U.S. 18, 69 S.Ct. 379, 93 L.Ed. 463 (1949).

The Act has also been interpreted to preempt state regulation in areas where the Board has declined to exercise its jurisdiction on the ground that it would not effectuate the policies of the Act to do so. *Bethlehem Steel Co. v. New York State Labor Relations Board*, 330 U.S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947).

The third category of cases in which the Court has found federal preemption of state regulation is where the activity is neither protected nor prohibited by the Act, and the national labor policy has been interpreted to

require that the activity should be wholly unregulated and left to the free play of economic forces. *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). *See, NLRB v. Nash-Finch Co.*, 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971). A variation within this third line of cases, presenting a limited aspect of preemption, are a number of cases in which the Court found the national labor policy to dictate that the labor relations of particular entities not be subject to the provisions of the NLRA, or any comparable state labor statutes, but not to preclude application of all state laws. *Hanna Mining Co. v. District 2, Marine Engineers Beneficial Association*, 382 U.S. 181, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965); *cf. Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974).

I

■ We first turn to the legislative history of the 1974 health care amendments (P.L. 93–360, 88 Stat. 395) to see if it indicates that Congress contemplated the preemption of state regulation of labor relations covered by these amendments. We conclude that such was the intent of Congress. *Accord, Methodist Hospital of Brooklyn v. New York State Labor Relations Board*, 382 F.Supp. 459 (S.D.N.Y. 1974); *State of New York v. Local 144, Hotel, Nursing Home and Allied Health Services Union*, 92 LRRM 2357 (S.D.N.Y. 1976); *North Shore University Hospital v. Levine*, 90 LRRM 2529 (E.D.N.Y.1975).

This intention emerges distinctly from the remarks made in both the House and

Senate during discussions of the 1974 amendments and from the fact that a proposal that the bill be amended specifically to insure the continuing vitality of state labor laws and prevent their preemption was rejected by both houses. 120 Cong.Rec. 12946, 12995 (May 2, 1974); 16899–900, 16904–906, 16908–911 (May 30, 1974); 22575–576, 22581–582 (July 10, 1974); 22942–943 (July 11, 1974). The remarks recommending that the NLRB favorably entertain the possibility of ceding jurisdiction back to the states under § 10(a)[4] of the Act, do not suggest a contrary Congressional understanding as to the preemptive impact of the 1974 amendments. 120 Cong. Rec. 22576, 22581–582 (July 10, 1974); 22942–943 (July 11, 1974). Indeed, such remarks were premised on the recognition that state regulation would be preempted and thus that § 10(a) ceding would be the only way that a state could continue to exercise jurisdiction.

Thus we find that Congress intended, by the 1974 amendments, to preempt from state regulation the labor relations of employees of private, voluntary, non-profit hospital employers such as those against whom the CIR filed representation petitions and unfair labor practice charges with the SLRB. Accordingly, if housestaff were employees of such hospitals, all labor disputes between these entities would be within the exclusive jurisdiction of the NLRB. However, the instant action does not present us with this easy case and thus this general expression of Congressional intent is not dispositive.

■ Here, the Board has ruled that housestaff are not "employees" as defined in the Act, but "primarily students."[5] *Cedars-Sinai Medical Center*, 223 NLRB No. 57 at 3, 8 (1976). It is properly within the power

---

4. Section 10(a) provides in pertinent part: "That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry . . . even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determina-

tion of such cases by such agency is inconsistent with the corresponding provision of this [Act] or has received a construction inconsistent therewith."

5. By so holding the Board rejected the contention that housestaff are "professional employees" as defined in Section 2(12) of the Act.

and duties of the Board, as the agency entrusted with the primary responsibility of administering and interpreting the Act, to make this initial determination as to the "employee" status of housestaff. *Packard Motor Car Co. v. National Labor Relations Board*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); *Bethlehem Steel, supra.* Indeed, this determination, and a finding that the employer is engaged in activity affecting interstate commerce, are threshold jurisdictional questions which the Board must always resolve before it may entertain any labor dispute presented to it. As a consequence of its finding in *Cedars-Sinai* that housestaff are not "employees," the Board was required to dismiss the union's representation petition because "no question affecting commerce exists concerning the representation of employees of the Employer within the meaning of Sections 9(c)(1) and 2(6) and (7) of the Act" (*Id.* at 3, 8).

The role of this Court is not to review this original determination by the Board, and we therefore express no opinion as to its soundness. The controversy in this case concerns the issue of whether or not defendant CIR may request the SLRB to assert jurisdiction over the representation petition and unfair labor practice charges which the CIR filed against the hospitals. The questions before us, then, is whether, given the Board's ruling that housestaff are not "employees" within the NLRA, the Board's further ruling in *Kansas City* that the labor relations of housestaff are preempted by the 1974 health care amendments from all state regulation is correct.

■ Since the Board has found that housestaff are not "employees" within the Act, it follows from the interlocking definition set forth in § 2(5),[6] that their union is not a "labor organization" under the Act as the Board so held in *Cedars-Sinai.* Section 7 delineates certain rights and protections which the Act affords to "employees." Section 8 prohibits an employer from engaging

in certain kinds of activity with regard to "employees" or a "labor organization" and provides parallel prohibitions against certain activity by a "labor organization." Section 9 regulates the procedures whereby "employees" designate or elect their representative for purposes of collective bargaining. Therefore, by their terms, §§ 7, 8 and 9 cannot apply to protect or prohibit any actions at all taken by housestaff or their union, or any actions taken by an employer with regard to housestaff or their union. *Cf. Beasley* and *Hanna Mining, supra.*

Accordingly, we conclude that the general Congressional intent to preempt state regulation of labor relations covered by the 1974 health care amendments cannot encompass the labor relations of housestaff and that the preemption doctrine articulated in *Garmon* and *Lockridge, supra*, does not apply.

## II

■ The second theory of preemption discussed earlier was delineated in *Bethlehem Steel, supra*, where the Board had ruled that foremen were "employees" within the definition of the Act and their employer was engaged in interstate commerce; thus the Board had jurisdiction over the representation petition filed by the foremen's union. However, the Board declined to exercise its jurisdiction on the ground that it would not effectuate the policies of the Act to do so. Under these circumstances, the Supreme Court found that for the state to apply its labor laws, and recognize a bargaining unit of foremen, would conflict with the federal labor policy that such units were inappropriate, and thus the Court held state regulation preempted. Plaintiff and *amici* urge this court to apply the rationale of *Bethlehem Steel* here.

The problem we find with doing so in this case is that one of the elements vital to

---

**6.** Section 2(5) states that: "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole

or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

*Bethlehem Steel* is missing. *Bethlehem Steel* was premised on the fact that the Board had jurisdiction over the foremen's petition. As the Court stated:

> The federal board has jurisdiction of the industry in which these particular employers are engaged and has asserted control of their labor relations in general. It asserts, and rightfully so, under our decision in the *Packard* case, *supra*, its power to decide whether these foremen may constitute themselves a bargaining unit. 330 U.S. at 776, 67 S.Ct. at 1031.

The clear import of this passage is that without the Board's ruling that foremen were "employees" within § 2(3)—a ruling upheld by the Supreme Court in *Packard, supra*—the Board could not "rightfully" assert power over the union's petition. This conclusion flows directly from the language of the NLRA which, except for the specific provision in § 14(a) concerning · "supervisors," [7] nowhere applies to the labor relations of *non-employees*, whether or not they happen to provide their services for entities that are "employers" under the Act.[8] The scope of the Board's power to interpret and administer the Act must necessarily be limited by the boundaries of the Act itself. Therefore, once the Board determined that housestaff are not "employees," it had no power to exercise over them and had no jurisdiction over them which it could decline to assert. Accordingly, we conclude that *Bethlehem Steel* does not control here.

### III

▉ Thus it is the preemption principle enunciated in the third group of cases noted earlier that could most properly apply here, where housestaff and their labor relations activities are, because of the Board's ruling,

neither protected nor prohibited by the Act. The crucial question, then, is whether national labor policy requires that housestaff labor relations be free from all regulation, state as well as federal, and left to the unrestrained interplay of economic forces in the marketplace. *Teamsters v. Morton, Machinists v. WERC, supra.*

We first consider whether there is anything in the legislative history of P.L. 93–360 which indicates that Congress specifically intended that housestaff should not be regulated by either the NLRA or any state labor laws.

The general purpose behind the enactment of the health care amendments to the NLRA was to "insure the continuity of health care to the community and the care and well being of patients" (Senate Report No. 93–766 at 4, 93d Cong. 2d Sess. (1974)), U.S.Code Cong. & Admin.News, 1974, pp. 3946, 3949. To this end, the previous exemption of non-profit health care institutions was deleted from § 2(2), on the ground that "the exemption of non-profit hospitals from the Act had resulted in numerous instances of recognition strikes and picketing" (*Id.* at 3, U.S.Code Cong. & Admin. News 1974, p. 3948). It was felt that "[c]overage under the Act should completely eliminate the need for any such activity, since the procedures of the Act will be available to resolve organizational and recognition disputes" (*Id.*). These special procedures under the Act include requirements that the union give 10-day notice before striking (new § 8(g)), and that the union and employer participate in mediation at the direction of the Federal Mediation and Conciliation Service (amended § 8(d)). Thus the general national labor policy expressed by Congress in enacting P. L. 93–

---

7. Section 2(3) states that the "term 'employee' . . . shall not include . . . any individual employed as a supervisor." However, Section 14(a) provides that "[n]othing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this Act shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining."

8. The Board in its original decision in *Kansas City General Hospital*, 225 NLRB No. 14 (1976), followed the logical consequence of its *Cedars-Sinai* ruling even one step further and found that the hospital was "not an 'employer' within the meaning of Section 2(2) of the Act for the purpose of any disputes relating to [housestaff]."

360 was that the labor relations of non-profit health care institutions should no longer be left to "the free play of economic forces" (*Nash-Finch*, 404 U.S. at 144, 92 S.Ct. at 377), but should be subject to regulation—uniform federal regulation, in particular.

The only specific position which Congress took on the question of whether or not housestaff would be included in this plan of national labor regulation, was in response to the suggestion that they might be considered "supervisors," and thus be excluded from the Act. On this issue, Congress indicated that housestaff would *not* come within the definition of "supervisor" in § 2(11). Consequently, a special provision to insure that housestaff would not be excluded from the Act was unnecessary. The Senate Report stated:

> [v]arious organizations representing health care professionals have urged an amendment to Section 2(11) of the Act so as to exclude such professionals from the definition of "supervisor". The Committee has studied this definition with particular reference to health care professionals, such as registered nurses, interns, residents, fellows, and salaried physicians and concludes that the proposed amendment is unnecessary because of existing Board decisions. The Committee notes that the Board has carefully avoided applying the definition of "supervisor" to a health care professional who gives direction to other employees in the exercise of professional judgment, which direction is incidental to the professional's treatment of patients, and thus is not the exercise of supervisory authority in the interest of the employer.
>
> The Committee expects the Board to continue evaluating the facts of each case in this manner when making its determinations. S. Report No. 93–766 at 6, U.S. Code Cong. & Admin.News 1974, p. 3951.

This resolution of the one possible exclusion problem that arose suggests that Congress, at the time it was considering the health care amendments, did not have any policy that housestaff should not be covered

by the Act or any other body of labor law. This interpretation of Congressional intent is further supported by the language used in this passage which indicates that Congress may well have thought that housestaff would be classified as "professional employees," as defined in § 2(12) of the Act.

Thus, what evidence there is of Congressional intent as to regulation of housestaff under the NLRA points toward their inclusion in the general national labor policy of relating labor relations in health care institutions. We certainly have found no clear expression in the legislative history of P.L. 93–360 of a contrary national labor policy that housestaff should be unregulated by both the NLRA and any state labor laws.

We next consider the NLRB's ruling on preemption. It appears that the Board's decision, *sua sponte*, to reconsider its order in *Kansas City* and address the preemption question was somewhat precipitate. As Chairman Murphy and Member Penello noted in the revised order:

> [t]he preemption issue was never raised or litigated by the parties nor was it considered or even contemplated by us in reaching our decision [originally]. Now that the New York Supreme Court has attempted to broaden the original Decision and Order to encompass the preemption issue, we have decided to join our colleagues in deleting the quoted language [that the hospital was "not an 'employer' within the meaning of Section 2(2) of the Act for the purpose of any disputes relating to (housestaff)] in this Revised Decision and Order to avoid even the slightest impression that a majority of this Board believes that state jurisdiction over residents, interns, and fellows has not been preempted by the Federal statute.
>
> In addition, however, Chairman Murphy notes that it was not her intent at the time this case was decided that the Board was preempting the field insofar as Federal labor policy might apply to interns and residents, but she has now been persuaded that this was the effect

of the 4 to 1 majority holding herein. 225 NLRB No. 14A at 4, fn. 6.

The rationale for its finding of preemption was expressed by the Board (Member Fanning dissenting) as follows:

It is our judgment that the Congress, in passing the 1974 health care amendments, simply made a determination that residents, interns, and fellows, *inter alia*, were not supervisors within the meaning of the Act, but left the question as to whether they were "employees" entitled to collective-bargaining rights for resolution by the Board in the exercise of its discretion. Having exercised its discretion in *Cedars-Sinai*, by finding residents, interns, and fellows to be primarily students and not "employees" within the meaning of the Act, the Board confirmed, in our view, that it has not put hospital residents and interns beyond the reach of national labor policy, but has rather held that to extend them collective-bargaining rights would be contrary to that very policy. 225 NLRB No. 14A at 4–5.

While this explanation does not amplify the Board's ruling on preemption as much as we might have liked, we think it clear enough that the Board reached its decision on the basis of its conclusion that it is the national labor policy that persons who are "primarily students" should not be afforded collective bargaining rights under the Act and should be unregulated by all labor laws, state and federal.

The Board, in the course of ruling on representation petitions by unions seeking to represent employees at educational institutions, has considered, in a number of cases, the propriety of including students working for the institutions in the petitioned-for bargaining units. *Leland Stanford Junior University*, 214 NLRB No. 82 (1974); *Barnard College*, 204 NLRB No. 155 (1973); *Cornell University*, 202 NLRB No. 41 (1973); *Georgetown University*, 200 NLRB No. 14 (1972); *College of Pharmaceutical Sciences in the City of New York*, 197 NLRB No. 142 (1972); *Adelphi University*, 195 NLRB No. 107 (1972).

In *Leland Stanford*, the Board ruled, as it did in *Cedars-Sinai*, that the graduate research assistants whose union sought certification of a collective bargaining unit were not "employees" within the meaning of § 2(2), and dismissed the union's petition. However, in all the other cases, the Board did not rule that students *per se* were not "employees" under the Act, but simply found that the students—referred to by the Board as "student employees," or "primarily students" or "not primarily employees" [9] —did not have a sufficient community of interest with the other, regular employees so as to make inclusion of the student workers in the petitioned-for units appropriate.

Thus in the majority of these cases, the Board seems to have acted on the principle that student workers are covered by the Act, and to have simply determined that they should not be part of the particular unit that was petitioned-for, and *not* that they should or could never be part of any collective bargaining unit. Indeed the Board in *Cedars-Sinai* appeared to have explicitly recognized and accepted this principle, stating:

[w]e are aware that the Board has included students in bargaining units and, in a few instances, has authorized elections in units composed exclusively of students . . . we do not find here that students and employees are antithetical entities or mutually exclusive categories under the Act. 223 NLRB No. 57 at 9.

Accordingly, we do not discern in these cases the expression of a uniform national labor policy that workers who are also students or "primarily students" should be denied collective bargaining rights.

We also have not been directed to, nor have we found, any expression of a national labor policy that students be wholly unregulated in either the Act itself or its legislative history. Nor have plaintiff or *amici* been able to articulate the rationale which would support such a national policy vis-à-

---

**9.** In *Cedars-Sinai*, the Board found that housestaff, "although they possess certain employee characteristics, are primarily students." 223 NLRB No. 57 at 3.

vis students. The impact which collective bargaining might have on the "student-teacher relationship" and the educational experience, which *amicus* Association of American Medical Colleges urges in support of the Board's ruling on preemption (AAMC Brief at 9–12), may be a legitimate concern of education policymakers, but this is surely beyond the scope of any national *labor* policy. Further, the student-teacher relationship is not analogous to the supervisor-employer relationship, and thus we do not find the policies which led to the statutory exclusion of "supervisors" from the Act—that their inclusion would improperly taint the collective bargaining process both for other employees and the employer, and would upset the balance of power—applicable here. For a fuller discussion of these policies see *Beasley*, 416 U.S. at 659–662, 94 S.Ct. 2023; *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Packard*, 300 U.S. at 496–500, 67 S.Ct. 789 (Douglas, J. dissenting).

Thus, although we are mindful of the deference we owe to the Board's formulations as the agency entrusted with the primary function of interpreting and administering the NLRA, we cannot agree that there is a uniform national labor policy that persons who are "primarily students" should not only be denied collective bargaining rights under the Act, but be left unregulated by any labor law, state as well as federal.

Accordingly, because we have not been able to find any national labor policy that requires that the labor relations of housestaff be totally unregulated and left to the free play of economic forces, we find that the preemption doctrine enunciated in *Teamsters v. Morton, Machinists v. WERC* or *Hanna Mining*, all *supra*, does not apply in the instant case.

### IV

Finally, we recognize that the provisions of the New York SLRA pertaining to hospital workers are not identical to the provisions of the NLRA health care amendments. Sections 713 and 716 of the Labor Law (McKinney's 1965) prohibit strikes and lockouts and require binding arbitration of any grievance or dispute in non-profitmaking hospitals. These requirements are more restrictive than the strike and arbitration provisions set forth in the NLRA § 8(d) and (g) (see discussion *supra* at 450). However, Congress has expressed particular concern over the disruptive effect on patient care of strikes in health care institutions, and has evidenced a basic intent that the labor relations of these institutions be regulated in order to prevent such disruption. The occurrence, last fall, of recognitional strikes by the CIR in response to the hospitals' refusals to bargain with the CIR because of the Board's ruling in *Cedars-Sinai* and the hospitals' contention that state regulation had been preempted (Gluckmann Affidavit of November 30, 1976 at 2–6), is exactly the evil sought to be removed by the enactment of the 1974 amendments. Thus we think that allowing the possibility of state regulation of housestaff is more in harmony with, and in furtherance of, the national labor policy and Congressional intent relating to health care institutions, than is foreclosing any state regulation of housestaff labor relations.

To summarize, our jurisdiction has been properly invoked under 28 U.S.C. § 1337 and we may exercise this jurisdiction under the *Nash-Finch* exception to the prohibition of 18 U.S.C. § 2283. Because of the NLRB's ruling that housestaff are not "employees" under the NLRA, the labor relations of housestaff physicians are not subject to the provisions of the Act and are not within the jurisdiction of the Board. We conclude that the NLRA does not preempt the exercise of state power over the labor relations of housestaff because we find that there is no national labor policy which requires that housestaff be unregulated by all bodies of labor law and controlled only by the free play of economic forces. Accordingly, we deny plaintiff's motion for a preliminary injunction and we grant defendant CIR's motion for summary judgment. This memorandum decision shall constitute the Court's findings of fact and conclusions of

law as required by Rule 52 of the Federal Rules of Civil Procedure.

SO ORDERED.