**LOCAL 2263, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL–CIO, et al., Plaintiffs,**

v.

**The CITY OF TUPELO, MISSISSIPPI, et al., Defendants.**

**No. EC 77–185–K.**

United States District Court,
N. D. Mississippi, E. D.

Nov. 2, 1977.

Michael S. Wolly, Washington, D.C., Thomas D. Bourdeaux, Meridian, Miss., for plaintiffs.

Guy Mitchell, III, Tupelo, Miss., for defendants.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

In this cause, Local 2263, International Association of Fire Fighters, AFL–CIO (Local Union), as a labor organization and on behalf of all members of the Local Union, and George Francis, the local Union's president, sue the City of Tupelo, its Mayor, Board of Aldermen, and Fire Chief (City Officials) pursuant to 42 U.S.C. § 1983 and invoking jurisdiction under 28 U.S.C. §§ 1343, 2201 and 2202, seeking declaratory and injunctive relief against the enforcement of resolutions adopted by the Mayor and Board of Aldermen prohibiting individuals occupying the positions of shift captains and station captains in the Tupelo Fire Department from belonging to a labor organization having in its membership rank and file fire fighters employed in the Tupelo Fire Department. Plaintiffs charge that these resolutions violate constitutionally protected rights of free association guaranteed by the First and Fourteenth Amendments to the United States Constitution to the members of the Local Union who are employed by the Tupelo Fire Department.

With the filing of the complaint on October 4, 1977, a temporary restraining order was sought. After notice, the court on October 14, 1977, conducted a brief hearing and issued a temporary restraining order against the City defendants enjoining enforcement of the aforesaid resolutions, and this injunctive order was continued in effect by agreement of the parties until October 31, or as soon thereafter as counsel could be heard. On October 25, City defendants filed their answer denying the charges, asserted that the resolutions under attack were not an impermissible infringement of First Amendment rights of individuals holding the positions of Fire Department Captains, and maintained that such individuals as supervisors owe a duty of undivided loyalty to the City of Tupelo and the resolutions were designed to avoid employees such as shift and station captains having to choose between opposing interests of the City as its employer and the Local Union as a member thereof.

Hearing on plaintiffs' application for preliminary injunction was presented to the court on November 1, and at the commencement thereof the court, by and with the consent of the parties, consolidated the final hearing on the merits with the application for a preliminary injunction. In addition to the evidence presented on the application for temporary restraining order, the court

received oral and documentary evidence from the plaintiffs and the defendants. After hearing arguments of counsel, the court finds that the case is ripe for final decision and now makes findings of fact and conclusions of law in accordance with Rule 52(a), F.R.Civ.P.

## (a) FINDINGS OF FACT

1. The Local Union was established at Tupelo on September 4, 1973, and membership therein was open to all employees in the Fire Department other than the Chief. The Union was established despite the announced opposition of the Mayor and Board of Aldermen for the necessity of any union in the Fire Department and they went on record that the City, in the exercise of its legal rights, would neither recognize the union nor bargain collectively with its representatives (Plt.Ex. 11). Public announcement of the City's position was made to the local citizenry. Notwithstanding, various employees in the Fire Department, including some having the rank of captain, joined the Union and participated in its activities. The failure of the City to recognize it or to bargain with it collectively has been a matter of some dissatisfaction to the Local Union. On September 18, 1974, the Union unanimously voted to picket City Hall, obviously because of its disenchantment with the treatment accorded to it by the City. Various problems in the Fire Department, unrelated to union activity, surfaced after 1974. These related to ineffective leadership afforded by Fire Chief Pannell and his assistant chiefs. The City was then requiring a 72-hour work week for all firemen to man the five fire stations consisting of headquarters Station No. 1 and 4 outlying stations in different parts of the City. Mayor Whitaker, now serving his second term, became concerned with what he regarded ineffective operations of the leadership in the Fire Department and conditions of employment. At some point in time the work was reduced from 72 hours to 56 hours per week.

2. On July 1, 1977, all except one of the aldermen were newly elected and took office along with Mayor Whitaker. Previously Pannell and his assistant chiefs had been retired. The Mayor and Board of Aldermen elected Curtis Sanders fire chief at the July meeting. Sanders had previously served as captain of fire prevention at Station No. 1 and before that as driver and fire fighter. In lieu of assistant chiefs, Sanders, with the approval of the City authorities, designated three shift captains, each of whom served directly under the Fire Chief for his 8-hour shift. A station captain was in charge of each of the 5 stations for his 8-hour shift, necessitating the employment of 15 station captains. Beside 3 shift captains and 15 station captains, the City employed 54 persons in the Fire Department comprised of 13 lieutenants, 15 sergeants and 26 drivers and fire fighters. As of this date, the City has decided to go on a 40-hour week effective November 9, 1977, which will increase the total rank and file membership below the grade of captain to 60 persons.

3. Chief Pannell, in 1973, posted rules and regulations designating that each station captain would be in charge of his station and of the men under his command; that the station captain would be in charge of all fires answered in his district, subject to coordination by the Assistant Chief in charge on that shift; and that the station captain would be authorized, if a fireman reported to work with a "hangover" to send him home without pay for one week, reporting that action to the Assistant Chief (Def.Ex. 1 at TRO hearing). These rules were well understood by all members of the fire force and were generally adhered to. When Sanders became Chief, he saw no necessity for having Pannell's rules remain posted and permitted their removal from the station house bulletin board since all fire employees were familiar with them. Each shift captain has city-wide jurisdiction and is over all station captains during his time on duty. The shift captain, where necessary, exercises supervision not only over the station captains in the maintenance of the station house, the fire fighting equipment and training, but also in the fighting of fires. The authority of the shift captain is subordinate only to that of the Fire Chief.

4. The duties and responsibilities of the station captain were the subject of conflicting testimony. Plaintiff Francis, the Union president and a lieutenant on the fire force, testified that the station captains had no real authority in the matter of hiring, firing, laying off, disciplining or suspending of an employee at the station house and, to his knowledge, the captain could not promote or recommend a man for promotion. According to Francis, a station captain could not transfer a man from one duty to another; that all firemen were trained and knew their job and that when they set out to fight a fire, no one was in charge. Francis further was of the opinion that the position of captain was an empty title without any real authority and existed solely because of one's experience and seniority to justify an increase in pay. Francis' testimony was, to a certain degree, corroborated by three station captains, Hoyle Williams, Billy Nichols and Roy Box. However, the testimony of the station captains must be viewed in the light of developments occurring since the institution of this suit. Each of them did acknowledge that the station captain was in charge of the station house during his shift and of the equipment and men there located. Each captain also testified that the first-in station captain at a fire is in charge of fighting the fire if it is in his territory and remains so until relieved by a superior, thus contradicting Francis' testimony that no one was in charge in fighting a fire. Williams, Nichols and Box further stated that since the discontinuance of Captain Brown as a training officer, each station captain was in charge of training rookie firemen employed at the station house and issued pre-assigned duties to each member under his command so that when fire service was needed, the men could work as an efficient team. These station captains, however, did say that they had not heretofore been vested with authority to hire, fire or promote men on the fire force, as those decisions were made by the Chief, and that they had not heretofore had responsibility to evaluate the job performance of each man at the station house. The City defendants, however, offered Chief Sanders, as

well as Captain Davis, a shift captain, who had served previously as a station captain for 2½ years. Curtis and Sanders affirmed that in the absence of the Chief, Davis as station captain, had been called upon to serve as Acting Chief. Both the Chief and Captain Davis testified that Francis was in error in stating that no one was in charge of fighting a fire, and they agreed with the testimony of Williams, Nichols and Box that each station captain had charge of a station house, its equipment and the crew; that the training responsibilities for rookie firemen was assumed and carried out by the station captain and that the first station captain in at a fire was definitely in charge of the operation if it was in his territory and remained so until relieved by either a shift captain or the Fire Chief. Davis stated as station captain he had on one occasion suspended a man for 6 hours for disobeying a rule, reporting his action to the Chief, and that the station captains have the prerogative to and do frequently transfer one man from a job to another depending on his ability to perform, and assign men to jobs depending on their capacity. The court resolves this issue of fact arising between the testimony offered on behalf of the plaintiffs and the City officials by finding that, from the great weight of the substantial evidence, the station captain does have control and responsibility for the operation and maintenance of the station house, the fire fighting equipment and vehicles and the men located at that station during the hours of his shift; that he has definite training, responsibilities for rookie firemen; that he assigns the duties to each man located at his station not only in maintenance and housekeeping problems but in fire fighting; that this is done on a predetermined basis in advance of fire alarms; that the station captain himself provides first-line supervision for all fires occurring within his territory and remains so until relieved by a superior officer; that the station captain transfers men from one task to another, depending upon their ability to perform, and that the station captains have in some instances, with the approval of the Fire Chief, docked a fireman's pay for vio-

lation of rules and made other recommendations to the Chief. However, the actual hiring, promotion and discharge are decisions which are made by the Fire Chief.

5. The resolution attacked by plaintiffs provides, in substance, that shift captains or station captains "will not be permitted to belong to a union or labor organization having as members rank and file fire fighters of the Tupelo Fire Department" and requiring that any such individuals who are members of any rank and file labor union must withdraw from such membership in order to retain their rank and position.[1] Thus, the current resolution affects only 18 persons (3 shift captains and 15 station captains). Although aimed at Local 2263, the resolution does not mention that union by name, nor does it prohibit membership in the union by firemen of lesser grade than captain. Neither does it prohibit captains from joining any labor association or organization whose membership does not consist of rank and file members in the Tupelo Fire Department.

6. After the evidence adduced at the temporary restraining order hearing where plaintiff. Francis testified that no one was in charge of fighting fires at Tupelo, the Mayor and Board of Aldermen on October 18, 1977, adopted a further resolution, consistent with the prior reorganization of the Fire Department, to the effect that a shift captain is generally in charge as operations officer of the entire Fire Department for each shift and declaring that the station captain assigned to each station during the period of his shift will exercise complete control over his station and be responsible for first-line supervision of the fighting of fires within the zone of his operation. The Fire Chief was directed to make the necessary assignment and delegation of duties to each station captain (Plt.Ex. 10, Dft.Ex. 21).

7. Pursuant to the foregoing resolution, the Fire Chief, after consulting with the City Attorney, promulgated, in written form, the duties and responsibilities of shift captains (Dft.Ex. 19) and of station captains (Plt.Ex. 2, Dft.Ex. 13, 14). The Chief has personally reviewed these written duties with each station captain, who signified his complete understanding and his willingness to act in accordance therewith. Admittedly, these duties somewhat enlarge upon the authority heretofore exercised by station captains, although many of these duties, as we have heretofore found, have been traditionally exercised by station captains and were merely incorporated in the new instruments. For example, ¶¶ 1, 2, 3, 7, 8, 9 and 13 relate to traditional responsibilities of the station captain for his station, i. e., responsibility for the building, its equipment and men; providing first-line supervision of all activities at the station house and at the fire; assigning duties to each of the men under his command; transferring firemen in accordance with their ability to perform the jobs properly; training rookie firemen; acquiring a thorough knowledge of the physical conditions and buildings throughout his district and alarm area, and an adequate understanding of his responsibilities as station captain; and giving what supervision was needed under the circumstances. The new duties, ¶¶ 4, 5, 6, 10, 11 and 12, specifically authorize station captains to discipline personnel, to suspend, dock pay, and impose other discipline, short of discharge; to evaluate job performance of each man and periodically submit such evaluations in writing to the Chief, for his use in personnel decisions; to adjust grievances subject to review by the shift captain and Fire Chief; to accept responsibility for securing immediate and appropriate first aid and/or medical treatment for any personnel injured in the line of duty; to designate a lieutenant to take temporary command during his absence from the station house, after notifying the shift captain, and to authorize personnel under his command to work overtime where the station captain may deem necessary.

---

1. The effective resolution is dated October 6, 1977, and supersedes an earlier resolution adopted August 16, 1977, providing only that "individuals occupying the position of captain in the Tupelo Fire Department will not be permitted to belong to a union." It is unnecessary for us to decide whether the earlier resolution was overly broad by denying either shift captains or station captains the right to join any association or labor organization.

8. Since its formation, the local union has continued to manifest dissatisfaction with the employment policies of the former as well as the present city administration. Their grievances obviously stem from the fact that the City has continuously refused to recognize the union or to engage with it in collective bargaining; that the City is without any merit or civil service system, and promotions are believed by many firemen to be based on political considerations, rather than quality of job performance. During the last municipal election the union president, with the endorsement of the union membership, circulated a questionnaire to all candidates for the office of alderman inquiring, inter alia, as to their position (a) on whether public employees should have the right to bargain collectively; (b) whether the candidate would be in favor of firemen establishing their own rules and regulations and electing their own fire chief; and (c) whether the candidate, if elected, would allow Local 2263 to have a payroll deduction for union dues (Df.Ex. 4). Other inquiries to aldermanic candidates related to their position on a merit system, civil service, or better job security for public employees. Local 2263, through its president, sought the opinion of the state attorney general as to the legality of what the union conceived to be a plan by the City to increase the hours worked per week without additional compensation (Dft.Ex. 16). The assistance of a legislator to obtain a civil service system for firemen at Tupelo was solicited by the union (Dft.Ex. 17). The union, moreover, requested from the city attorney advice as to the legal procedure for bringing a referendum before the voters on municipal policies relating to the fire department.

9. Francis himself has been discharged on two occasions but after hearing reinstated. Nevertheless, he feels that he has several times been passed over for promotion to captain because of his prominent union activity, as others having lesser service have been promoted to the position of station captain. Francis is clearly dedicated to a program of achieving greater benefits for firemen through concerted union activity.

10. Local 2263 has not yet taken a position on whether, should the occasion arise, the union would strike; however, it has not given a no-strike pledge. So far, no picketing of City Hall has actually occurred. Yet Captains Nichols and Box, who are local union members, testified that in the event of picketing, they would join the picket in their off-duty hours but would refrain from picketing during on-duty hours, and would in fact cross picket lines they had previously manned. This conduct could satisfy neither the union nor the City. It is not clear from the evidence precisely what position these station captains would take in the event of a strike. Inevitably, the station captain who was a member of a rank and file union would be torn between his duty to the City as employer to take charge of fighting a fire and his opposing duty to his union to support its position of no work, despite need for vital public service.

11. Every station captain who testified at trial, either for plaintiff or the defense, agreed that the additional grant of authority recently conferred upon them by Chief Sanders would make supervision more efficient and effective and would enable a station captain to better perform his responsibilities in the chain of command.

12. Notwithstanding plaintiffs' contention that the recent grant of authority to station captains is a pretext and was established solely to buttress the City's position in this litigation, we find as a fact that the municipal authorities as well as the Fire Chief acted from a desire to have an effective fire fighting force and a well-disciplined organization. Moreover, Fire Chief Sanders, by conferring greater authority upon his station captains, expects them to adhere to their commitment to carry out the enlarged duties. Unquestionably, the written instruments which specifically outline duties for both shift and station captains not only removes any confusion, doubt or misunderstanding about the function of captains at both levels, but also will result in improved, efficient and more adequate supervision in all areas of the fire fighting operation, at the station house as well as in

fighting fires. The new duties should also serve to minimize past grievances that promotions are attained largely through political considerations, and not merit or job performance, since each fireman will be subject to periodic evaluation as to job performance and will have the assurance that if his work is satisfactory, his station captain will have a voice in recommendations for promotions (¶ 5).

## (b) CONCLUSIONS OF LAW

1. This court has undoubted jurisdiction of this controversy under 28 U.S.C. § 1343 to hear and determine causes of action based upon 42 U.S.C. § 1983.

 2. There is no disagreement between the parties that the First Amendment right to freedom of association extends to economic associations such as labor unions. *Thomas v. Collins*, 323 U.S. 516, 531, 65 S.Ct. 315, 89 L.Ed.2d 430 (1945), or that public employees as well as private employees enjoy these protections. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Nor can it be doubted that one who becomes a public employee does not thereby waive his constitutional rights because of his status as a public employee. *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Nevertheless, it is equally well settled that, as broad as the protections of the First Amendment are, they are not without limit, particularly with respect to public employees. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). The Fifth Circuit recognized in *Battle v. Mulholland*, 439 F.2d 321 (1971), "that the state [or any subdivision thereof] as an employer has an interest in regulating the conduct of its employees in ways which may be more restrictive than those which can be applied to citizens who are not employees." at 324.

 3. Citing *Pickering*, the Fifth Circuit stated "[t]he problem is to balance the rights of the employees as citizens against the interest of the state in promoting efficient job service." Id. Thus, to determine what limits the City of Tupelo may constitutionally put on First Amendment activities of its employees in the fire department necessitates a balancing of the public interest asserted as a justification against the interest of the individuals or groups affected and whose rights are sought to be restricted by the public employer. Where First Amendment freedoms are limited by a municipality, it must show (1) that a substantial, legitimate interest, (2) will in fact be served, and (3) that the limit imposed on First Amendment activities of its employees is the least drastic restriction of constitutional rights which will accomplish the state's legitimate objective. *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). See dissenting opinion by Circuit Judge Gewin in *Abbott v. Thetford*, 529 F.2d 695, 707 (1976), adopted en banc, *Abbott v. Thetford*, 534 F.2d 1101 (1976). The Fifth Circuit specifically instructs us to look at the "time, place and circumstances" involved in striking the necessary delicate balance between the governmental interest and the constitutional rights of an individual affected by a governmental regulation.

 4. The City, as a justification for the passage of the challenged resolution, asserts that there is a need for an efficient fire fighting force which is adequately supervised and controlled. The claim is made that there is a substantial and important governmental interest in having available for the protection of the lives and property within the City of Tupelo an efficient, well disciplined fire department, and the City claims that station captains, no less than shift captains, are supervisory personnel for whom union membership representing rank and file fire fighters at Tupelo, whom the captains are required to supervise, would necessarily pose a conflict of interest resulting in impairing the efficiency of this vital public service. It is not open to challenge that an efficient fire department is a legitimate and substantial state interest. *Civil Service Commission v. National Association*

*of Letter Carriers,* supra; *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2980, 37 L.Ed.2d 830 (1973); *Elk Grove Firefighters Local No. 2340 v. Willis,* 400 F.Supp. 1097 (N.D.Ill.1975), aff'd 539 F.2d 714 (7 Cir. 1976) (unpublished order); *cf. Norbeck v. Davenport Community School District,* 545 F.2d 63, 68 (8 Cir. 1976), cert. denied 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977). It goes without saying that there is a strong governmental interest in the protection of lives and property through the delivery of efficient fire service, and plaintiffs do not contend otherwise. In resolving the balance between the promotion of an important, substantial governmental objective and the intrusion of First Amendment rights of an individual, the City officials have undertaken to strike a line of demarcation at the rank of captain and above in prohibiting their becoming members of a rank and file union composed of men under their command. In the sector of private employment, there is statutory authorization in § 14(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 164(a), which provides that no employer shall be compelled to regard supervisors as employees for the purpose of collective bargaining. This provision was strengthened by the Taft-Hartley Amendments of 1947, 29 U.S.C. § 152(11),[2] expressing a policy judgment that supervisory membership in rank and file unions is inimical to efficiency. Although LMRA does not apply to public employers, this court is persuaded that the judgment of Congress affords a reliable guide for our determination of balancing the interest of the City of Tupelo in seeking to maintain an efficient fire department with the constitutionally protected interest of union members. The Fifth Circuit has recognized that in enacting this federal labor law legislation, Congress' preeminent purpose was "to give the employer a free hand to discharge foremen [or other supervisory personnel] as a means of ensuring their undivided loyalty in spite of any union obligations." *Gaf Corp. v. N.L.R.B.,* 524 F.2d 492, 495 (1975). See *Beasley v. Food Fair of North Carolina,* 416 U.S. 653, 658–62, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974).

■ 5. We are persuaded from the overwhelming evidence in this case that station captains, no less than shift captains, are supervisory personnel in that at all times in the past they have had definite responsibilities for directing the men under their command at the station house, transferring employees from one job to another, assigning duties to employees at the station house and, more importantly, to act as the first-line supervisor in any fire occurring within his district, and to remain in charge of the fire unless relieved by a higher officer. It is equally clear that the discharge of these duties is not such as might properly be classified as a routine or clerical nature but they do, both individually and collectively, require the use of independent and experienced judgment. The ability of the fire fighting force, in the final analysis, to improve its efficiency rests upon the unimpaired ability of the station captain to train rookie firemen and direct and control veteran firemen under his command. We are unable to see any distinction in the quality of supervision that has existed between the shift captains on the one hand and that of the station captains, except that the shift captains are supervisors of a higher order. Plaintiffs urge that there can be no justifiable reason for closing mere membership in a union to the captains and that so long as a conflict between the interests of the union and the position of the City does not devel-

---

**2.** The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

It is well-settled in case law that because the statutory criteria of a supervisor are set forth in the disjunctive, the exercise of any one of the stated functions by an employee is sufficient to bring him within the statutory definition. *Sweeney & Co. v. N.L.R.B.,* 437 F.2d 1127, 1131 (5 Cir. 1971).

op, the restriction upon captains belonging to a rank and file membership is an unnecessary and unconstitutional infringement of their right of free association. We regard this contention as a naivety, for the announced purpose of the local union and its program of activity is to take positions in opposition to the employment policies adopted by the City officials. Of course, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Battle v. Mulholland, supra*, at 324. However, much more than unfounded fear or mere apprehension is revealed by the record in this case. The likelihood of opposing interests between the City and the union on employment issues poses a threat to supervisory personnel of a serious conflict of interests, a question of what position to take in event of a showdown situation—whether to side with the City as the employer or to support the union. The testimony from the station captains is eloquent evidence of the compromising position in which they would be placed should the union order a picket, or a work slow-down or even a strike, with dire consequences likely to result from curtailment of a vital public service. The City, in freeing supervisory personnel from this dilemma, has not acted in an unreasonable or unconstitutional manner, for station captains as well as shift captains are free to join any labor organization or association they may choose, whether it be one of their peers or of supervisory personnel only, or whether it be any other labor organization, just so long as it is not the same labor union which has within its membership rank and file firemen employed by the City of Tupelo. The regulation is drawn narrowly to protect to the maximum extent the First Amendment rights of the shift captains and station captains. This restriction, which we find essential to the public interest, will not be inimical to or destroy the local union. It is free to solicit membership from at least 60 members of the Tupelo Fire Department and can carry on, within the limits of the

law, a program designed to achieve maximum benefits for all firemen, including its members and non-members alike. In reaching this conclusion, we accept the rationale of the well-reasoned opinion of the district court in *Elk Grove Firefighters Local No. 2340 v. Willis, supra*, which was affirmed by the Seventh Circuit and cited with approval by the Eighth Circuit in *Norbeck, supra*.

The principal authority upon which plaintiffs rely is a decision by Judge Blatt of the United States District Court of South Carolina in *Holder v. City of Columbia*, 71 Labor Cases, Para. 53, 128 (DSC 1972), where the court allowed fire officers having supervisory status to join a rank and file union on the ground that there had been no evidence of any disciplinary problems in the fire department. In *Holder* there was no balancing, as was required by *Pickering* and its progeny, of the governmental interest sought to be promoted by the regulation and the constitutional rights of the individuals affected. In *Holder* the court was of the view that it would be time enough to grant injunctive relief and to bar supervisors from joining a rank and file labor union in the event of actual breakdown of discipline and deterioration in the affairs of the Columbia Fire Department.

In our view, due regard should be paid to the judgment of the local governmental body which undertakes in a reasonable and justifiable manner to prevent an actual deterioration or breakdown in the delivery of a vital public service like fire protection, and that it should not be faulted by a court for using reasonable foresight, under the known facts disclosed by this record, to assure an efficient, well disciplined fire fighting force, which is capable of performing at optimum capacity for the protection of the lives and property of the citizens of Tupelo.

Finding that the resolutions are narrowly drawn and that they serve a legitimate and substantial governmental interest, and that the intrusion upon the First Amendment rights of the shift captains and station captains are no more than what is required by the public interest, we hold that the plain-

tiffs are not entitled to a preliminary injunction or declaratory relief and that their complaint should be dismissed.

Let an order be issued accordingly.