BEASLEY ET AL. *v.* FOOD FAIR OF NORTH
CAROLINA, INC., ET AL.

No. 72–1597.   Argued February 19, 1974—Decided May 15, 1974

BRENNAN, J., delivered the opinion for a unanimous Court.

*Larry L. Eubanks* argued the cause and filed a brief for
petitioners.

*Ralph M. Stockton, Jr.,* argued the cause for respond-
ents.   With him on the brief were *J. Robert Elster* and
*James H. Kelly, Jr.**

---

*Briefs of *amici curiae* urging affirmance were filed by *Solicitor
General Bork, Peter G. Nash, John S. Irving, Patrick Hardin,* and

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Taft-Hartley amendments [1] of the National Labor Relations Act excluded supervisors from the protections of the Act and thus freed employers to discharge supervisors without violating the Act's restraints against

---

*Norton J. Come* for the National Labor Relations Board, and by *James M. Miles* for Associated Industries, Inc., et al.

[1] Labor Management Relations Act, 1947, c. 120, 61 Stat. 136. The three amendments relevant to this case provide:

§ 2 (3). "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined." 61 Stat. 137, 29 U. S. C. § 152 (3).

§ 2 (11). "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 61 Stat. 138, 29 U. S. C. § 152 (11).

§ 14 (a) "Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this Act shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining." 61 Stat. 151, 29 U. S. C. § 164 (a).

discharges on account of labor union membership. The question in this case is whether those amendments also freed the employer from liability in damages to the discharged supervisors under §§ 95–81 and 95–83 of North Carolina's right-to-work law that provides such an action for employees discharged for union membership.[2]

Respondent Food Fair of North Carolina, Inc. (Food Fair), a grocery chain, operates stores throughout North Carolina. Petitioners were managers of meat departments in Food Fair Stores in the Winston-Salem area. When Local 525 of the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, organized the stores' meatcutters, petitioners also joined the union. Food Fair discharged them, allegedly on account of their union membership, immediately after Local 525 won a representation election conducted by the National Labor Relations Board. The Local claimed that the discharges constituted an unfair labor practice and filed charges with the Regional Director of the NLRB. The Regional Director refused to issue a complaint on the ground that petitioners were "supervisors" excluded from the Act's protection. On appeal, the NLRB General

---

[2] Those sections provide:

"§ 95–81. Nonmembership as condition of employment prohibited.—No person shall be required by an employer to abstain or refrain from membership in any labor union or labor organization as a condition of employment or continuation of employment." N. C. Gen. Stat. § 95–81 (1965).

"§ 95–83. Recovery of damages by persons denied employment.—Any person who may be denied employment or be deprived of continuation of his employment in violation of §§ 95–80, 95–81 and 95–82 or of one or more of such sections, shall be entitled to recover from such employer and from any other person, firm, corporation, or association acting in concert with him by appropriate action in the courts of this State such damages as he may have sustained by reason of such denial or deprivation of employment." N. C. Gen. Stat. § 95–83 (1965).

Counsel refused to issue a complaint, on the same ground.[3] Petitioners thereupon brought this suit in state court against Food Fair under § 95–83. Food Fair contended successfully that the second clause of § 14 (a) of the National Labor Relations Act, 29 U. S. C. § 164 (a)—"but no employer . . . shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining"—prohibited enforcement of the state law·in favor of supervisors, and was granted summary judgment. The North Carolina Court of Appeals reversed in reliance -upon *Hanna Mining* v. *Marine Engineers,* 382 U. S. 181 (1965). 15 N. C. App. 323, 190 S.. E. 2d 333 (1972). The North Carolina Supreme Court in turn reversed the Court of Appeals and reinstated the summary judgment. 282 N. C. 530, 193 S. E. 2d 911 (1973). We granted certiorari, 414 U. S. 907 (1973). We affirm.

·Petitioners concede that the Taft-Hartley amendments exclude supervisors from the protection of the Act. And it is undisputed that petitioners' status as "supervisors" has been settled by the determinations of the Regional Director and General Counsel of the NLRB. See n. 3, *supra; Hanna Mining* v. *Marine Engineers, supra,* at 190; Brief for Respondents 7. The Act therefore did. not protect petitioners against discharge by Food Fair solely because of their membership in Local 525. · *Oil City Brass Works* v.·*NLRB,* 357 F. 2d 466 (CA5 1966); *NLRB* v.

---

[3] The position of the General Counsel was unequivocally set forth in the letter of denial, quoted by the North Carolina Court of Appeals: "Your appeal in the above matter has been duly considered. The appeal is denied. The four alleged discriminatees involved herein were supervisors within the meaning of Section 2 (11) of the Act and hence were not entitled, in the circumstances herein, to the protection of the Act." 15 N. C. App. 323, 325, 190 S. E. 2d 333, 334 (1972).

*Fullerton Publishing Co.*, 283 F. 2d 545 (CA9 1960). See *NLRB* v. *Inter-City Advertising Co.*, 190 F. 2d 420 (CA4 1951); *NLRB* v. *Griggs Equipment, Inc.*, 307 F. 2d 275 (CA5 1962); *NLRB* v. *Big Three Welding Equipment Co.*, 359 F. 2d 77 (CA5 1966); Brief for Petitioners 8–9.

Our inquiry is thus narrowed to the determination of whether Congress, in addition to denying the protections of the federal law to supervisors discharged for union membership, should be taken as having also precluded North Carolina from affording petitioners its state damages remedy for such discharges. Section 14 (a) does not wholly foreclose state regulations respecting the status of supervisors, but its two clauses require individualized consideration in view of the Court of Appeals' reliance on *Hanna Mining. Hanna*, construing the first clause— "Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization"—held that "certainly Congress made no considered decision generally to exclude state limitations on supervisory organizing," 382 U. S., at 190. The Court accordingly held that the Wisconsin anti-picketing statutes—that furthered, not hindered, the Act's limitations—could be applied to activity by a union of supervisors.

That construction, of course, is consistent with the objectives of the section. But the second clause is a broad command that no employer shall be compelled to treat supervisors as employees for the purpose of "any law, either national or local, relating to collective bargaining." Consistently with this broader command, and *Hanna*'s further statement that "Congress' propelling intention was to relieve employers from any compulsion under the Act and under state law to countenance or bargain with any union of supervisory employees," 382 U. S., at 189, the North Carolina Supreme Court concluded that §§ 95–81 and 95–83 of the State's right-

to-work law contravened the congressional objective. That court held: "To permit a state law to deprive an employer of his right to discharge his supervisor for membership in a union would completely frustrate the congressional determination to leave this weapon of self-help to the employer." 282 N. C., at 541, 193 S. E. 2d, at 918.

Petitioners argue, however, that Congress must have meant that the reach of the limitation of the second clause that "no employer . . . shall be compelled to deem . . . supervisors as employees for the purpose of any law, either national or local, relating to *collective bargaining*" (emphasis supplied) did not bar state damages remedies for the discharge of supervisors for union membership but was a limited prohibition against state regulations that compel the employer to bargain collectively with unions that include supervisors as members. The legislative history of § 14 (a), read with its companion amendments, §§ 2 (3) and 2 (11), satisfies us that Congress embraced laws like North Carolina's §§ 95–81 and 95–83 within the prohibition against "any [local] law . . . relating to collective bargaining."

Section 2 (3) of the National Labor Relations Act before the 1947 Taft-Hartley amendments provided that "[t]he term 'employee' shall include any employee . . . ." 49 Stat. 450. The NLRB, after much vacillation,[4] interpreted this term as including supervisors. *Packard*

---

[4] The Board initially held that supervisors may organize in independent or affiliated unions, *Union Collieries Coal Co.*, 41 N. L. R. B. 961 (1942); *Godchaux Sugars, Inc.*, 44 N. L. R. B. 874 (1942). Then, following introduction of proposed corrective legislation, see H. R. Rep. No. 245, 80th Cong., 1st Sess., 13 (1947), the Board announced that it would not find any organization of supervisors an appropriate bargaining unit, *Maryland Drydock Co.*, 49 N. L. R. B. 733 (1943). Finally, in *Packard Motor Co.*, 61 N. L. R. B. 4 (1945), the Board reverted to its initial position.

*Motor Car Co.* v. *NLRB,* 330 U. S. 485 (1947), sustained the Board. Congress reacted by amending §§ 2 (3) and 2 (11), and enacting § 14 (a) for the express purpose of relieving employers of obligations under the Act when supervisors, if employees under the Act, would be the focus of concern. *Hanna Mining* v. *Marine Engineers, supra,* at 188. Those amendments were the product of compromise of H. R. 3020 and S. 1126, 80th Cong., 1st Sess. (1947). There were differences in the specific provisions addressed to supervisory employees,[5] but no difference in objective. Employers were not to be obliged to recognize and bargain with unions including or composed of supervisors,[6] because supervisors were manage-

---

[5] Although H. R. 3020 lacked a counterpart to § 14 (a) in S. 1126, it contained a more detailed, and expansive, definition of "supervisor," including individuals with "hire-and-fire" authority, those who worked in "labor relations, personnel, employment, police, or time-study matters ... or who [are] employed to act in other respects for the employer in dealing with other individuals employed by the employer," and those with access to information "of a confidential nature." § 101, amending § 2 (12) of NLRA, H. R. 3020, 80th Cong., 1st Sess. (1947).

Aside from the use of the Senate's proposals for §§ 2 (3), 2 (11), and 14 (a) in the final amendments, the only pertinent congressional action during passage was the addition of the words "or responsibility to direct them" to § 2 (11) on the floor of the Senate. 93 Cong: Rec. 4677–4678 (1947).

[6] The legislative history is determinative of any contention that a different rule should be applied for unions composed entirely of supervisors, on the one hand, and for unions of the rank and file as well as supervisors, on the other. The House Report emphatically stated:

"If management is to be free to manage American industry as in the past and to produce the goods on which depends our strength in war and our standard of living always, then *Congress must exclude foremen from the operation of the Labor Act, not only when they organize into unions of the rank and file and into unions affiliated with those of the rank and file, but also when they organize into*

ment obliged to be loyal to their employer's interests, and their identity with the interests of rank-and-file employees might impair that loyalty and threaten realization of the basic ends of federal labor legislation. Thus the House Report stated:

> "*Management, like labor, must have faithful agents.*—If we are to produce goods competitively and in such large quantities that many can buy them at low cost, then, just as there are people on labor's side to say what workers want and have a right to expect, there must be in management and loyal to it persons not subject to influence or control of unions, not only to assign people to their work, to see that they keep at their work and do it well, to correct them when they are at fault, and to settle their complaints and grievances, but to determine how much work employees should do, what pay they should receive for it, and to carry on the whole of labor relations." H. R. Rep. No. 245, 80th Cong., 1st Sess., 16 (1947).

unions that claim to be independent of the unions of the rank and file." H. R. Rep. No. 245, 80th Cong., 1st Sess., 15 (1947) (emphasis in original.)

The Senate Report displays equally careful consideration and firm rejection of such a distinction:

"Before formulating this definition [in § 2 (11)], the committee considered a proposal, occasionally advanced, which would have limited the protection of foremen to joining or organizing unions whose membership was confined to supervisory personnel and not affiliated with either of the major labor federations. After considerable discussion, the committee decided that any such compromise would be completely unrealistic. There is nothing in the record developed before this committee to justify the conclusion that there is such a thing as a really independent foremen's organization." S. Rep. No. 105, 80th Cong., 1st Sess., 4 (1947).

Further:

> "The bill does not forbid anyone to organize. It does not forbid any employer to recognize a union of foremen. Employers who, in the past, have bargained collectively with supervisors may continue to do so. What the bill does is to say what the law always has said until the Labor Board, in the exercise of what it modestly calls its 'expertness,' changed the law: That no one, whether employer or employee, need have as his agent one who is obligated to those on the other side, or one whom, for *any* reason, he does not trust." *Id.,* at 17 (emphasis in original).

The same theme—that unionizing supervisors threatened realization of the basic objectives of the Act to increase the output of goods in commerce by promoting labor peace—is repeated in the Senate Report. The Report refers to the NLRB rulings that included supervisors as protected employees as

> "[a] recent development which probably more than any other single factor has upset any real balance of power in the collective-bargaining process . . . .
>
> "The folly of permitting a continuation of this policy is dramatically illustrated by what has happened in the captive mines of the Jones & Laughlin Steel Corp. since supervisory employees were organized by the United Mine Workers under the protection of the act. Disciplinary slips issued by the underground supervisors in these mines have fallen off by two-thirds and the accident rate in each mine has doubled." S. Rep. No. 105, 80th Cong., 1st Sess. 3, 4 (1947).

This history compels the conclusion that Congress' dominant purpose in amending §§ 2 (3) and 2 (11), and enacting § 14 (a) was to redress a perceived imbalance in

labor-management relationships that was found to arise from putting supervisors in the position of serving two masters with opposed interests. See generally *NLRB* v. *Bell Aerospace Co., ante,* p. 267. We conclude, therefore, that the second clause of § 14 (a) relieving the employer of obligations under "any law either national or local, relating to collective bargaining" applies to any law that requires an employer "to accord to the front line of management the anomalous status of employees." S. Rep. No. 105, *supra,* at 5. Enforcement against respondents in this case of §§ 95–81 and 95–83 would plainly put pressure on respondents "to accord to the front line of management the anomalous status of employees," and would therefore flout the national policy against compulsion upon employers from either federal or state agencies to treat supervisors as employees. Cf. *Teamsters Union* v. *Morton,* 377 U. S. 252, 258–260 (1964).[7]

*Affirmed.*

---

[7] Petitioners also argue that § 14 (b) supports their contention. That section provides that "'[n]othing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law." The section obviously has no relevancy to the provisions of §§ 95–81 and 95–83. It is relevant primarily to § 95–79, which declares illegal certain agreements making union membership a condition of employment. See *Retail Clerks* v. *Schermerhorn,* 373 U. S. 746 and 375 U. S. 96 (1963); *Algoma Plywood Co.* v. *Wisconsin Board,* 336 U. S. 301 (1949).