NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The GREASE COMPANY and Theatre
Now, Inc., Respondents.

No. 214, Docket 76–4087.

United States Court of Appeals,
Second Circuit.

Argued Jan. 11, 1977.

Decided March 30, 1977.

Rehearing En Banc Denied Aug. 8, 1977.

Richard Adelman, New York City (Theodore W. Kheel, Battle, Fowler, Lindstone, Jaffin, Pierce & Kheel, Barandes, Rabbino & Arnold, New York City, of counsel), for respondents.

Corinna L. Metcalf, N.L.R.B., Washington, D.C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Robert G. Sewell, Jay E. Shanklin, Morton Namrow, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Before GURFEIN and MESKILL, Circuit Judges, and BARTELS, District Judge.*

MESKILL, Circuit Judge:

This is a petition for enforcement of an order of The National Labor Relations Board. The dispute arose in June, 1973, when the carpenter and assistant carpenter of the national road company of the musical comedy "Grease" were discharged. The NLRB found that the discharge was imposed for participation in protected union

---

* Of the Eastern District of New York, sitting by designation.

activities, and hence an unfair labor practice in violation of §§ 8(a)(1) and 8(a)(3) of The National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3). Because we find that the Board's order was not supported by substantial evidence, we deny enforcement. 29 U.S.C. § 160(e).

The Grease Company is a limited partnership organized under the laws of New York. It is engaged in producing the musical comedy "Grease" throughout the United States and Canada. Theatre Now is in the business of theatrical management. One of its principals, Edward Davis, was engaged as the general manager of the road company of "Grease." Before the show began its national tour, Davis engaged John Doucette, Sr. as the show's carpenter. At Doucette, Sr.'s request, John Doucette, Jr. was hired as assistant carpenter.

The show's final stop, in Los Angeles, was reached on June 12. On June 17, the Doucettes were discharged without explanation. The following morning, Doucette, Sr. called Davis, the general manager, in an effort to learn why he and his son had been fired. At this point, there is a direct conflict in the testimony.

Doucette testified that Davis told him that he had been fired for participation in a grievance proceeding. Doucette, Sr. functioned as the shop steward of the road company. Between May 29 and June 2, 1973, he represented the show's soundman, Weeden, at a grievance proceeding in Cincinnati. The meeting resulted in the adjustment of the grievance.[1]

Davis testified, however, that he told Doucette that the reason for his discharge was the unhappiness of the show's producers with his work, and flatly denied making any mention of union activities. Davis claimed that Doucette had been fired because his work was unsatisfactory.

As the Administrative Law Judge expressly found, the producers were greatly displeased with the appearance of the show when it reached Toronto in mid-April. Their complaints were as follows. Many of the props looked shabby; the scenery was generally in need of painting; one scenery panel, depicting an Edsel, was missing entirely; another panel was warped and cracked; the "masking" which blocked out the sides of the stage was not hung; and the scenery was being changed too slowly. There was expressly credited testimony that the show's managers blamed most of these problems on the Doucettes.[2] These problems were partially corrected when the show reached its next stop, in Detroit.[3]

There is further credited testimony that discussions concerning firing Doucette, Sr. were held among the show's management in Toronto. The Administrative Law Judge expressly found that the stage manager, Marino, demanded that Doucette be fired, and was told that this would be done at a convenient time.

The unfair labor practice charge is thus based largely on Doucette's uncorroborated report of Davis' statement that he had been fired for union activities and the fact that Doucette did represent Weeden at two grievance proceedings.[4] Against this is the expressly credited testimony of the show's managers that Doucette's work was considered unsatisfactory.

1. The soundman was discharged for what the producers felt was his inadequate work. The grievance concerned his right to vacation pay after the firing. This indicates, if nothing else, that management was willing to summarily discharge employees for what was felt to be below average performance.

2. It now appears that much of the blame was unmerited, and that Doucette, Sr. was not responsible for many of the show's deficiencies. For our purposes of review, however, this does nothing to counter the fact that management believed that the show's problems were Doucette's fault, justifying his termination.

3. There is some evidence, however, that Doucette was somewhat grudging and uncooperative in remedying these defects.

4. While Davis admitted a telephone call to Doucette after the first grievance meeting inquiring why Doucette had been "getting involved in this," Davis also testified that he had approved Doucette's advising Weeden of "his rights" and ended by stating "Now let's let them take care of it."

We are required to uphold a finding by the Board if it is supported by substantial evidence, considered on the record as a whole. "Substantial" in this context means such evidence as would prevent the direction of a verdict in a jury trial. We have carefully reviewed the entire record in this case, and have concluded that the Board's ruling does not meet this standard. Accordingly, the order cannot stand.[5]

Respondents also vigorously urge that Doucette, Sr. was a "supervisor" within the meaning of §§ 2(3), (11) of the NLRA, 29 U.S.C. §§ 152(3), (11), and hence could be fired for union activities. *See Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 655–56, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974). The determination of supervisory status is a difficult question of fact. *Compare N. L. R. B. v. Metropolitan Life Ins. Co.*, 405 F.2d 1169, 1172–73 (2d Cir. 1968), *with Illinois State Journal-Register, Inc. v. N. L. R. B.*, 412 F.2d 37, 40–44 (7th Cir. 1969), *and N. L. R. B. v. Doctors Hospital*, 489 F.2d 772, 776 (9th Cir. 1973). *Cf. Bayside Enterprises, Inc. v. N. L. R. B.*, 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977). In view of our disposition of this case, however, we need not decide this difficult issue.

The petition of the National Labor Relations Board for enforcement of its order is denied.[6]

---

5. In evaluating the record, we have considered the findings of the administrative law judge on the question of credibility. Nevertheless, it is doubtful that management in a highly organized industry would respond with hostility towards a shop steward carrying out routine union duties. Moreover, we note that the grievance proceeding itself demonstrated none of the anti-union animus now attributed to management.

Similarly, Doucette's contract gave his employers the right to discharge him "without cause." It is highly improbable that an employer venal enough to fire two important workers for minor union activities in this industry would volunteer this information when no explanation was required.

6. Doucette, Jr.'s contract also provided that he could be fired without cause. When Doucette, Sr. spoke to Davis, he asked about his son's discharge, and was told that it was "because he is your son." In view of our holding that the discharge of Doucette, Sr. did not violate the NLRA, it follows that the discharge of his son likewise did not violate the Act.