772 F.2d 88
 120 L.R.R.M. (BNA) 2439, 54 USLW 2165
 Timothy WILTON and Alfred Sullivan, Appellees,
v.
MAYOR AND CITY COUNCIL OF BALTIMORE, a municipal
corporation, and Linwood Jennings and Dr. Addison W. Pope
and Avrum K. Rifman and Harriet P. Trader and H. Mebane
Turner and Nicholas Van Saint, in their official capacity as
members of the Baltimore City Jail Board; Helen Wyatt;
Wilson Gilbert; Lucius Abron; Howard Parks, and Robert
Richmond, individually and as members of Evaluation Board,
Baltimore City Jail; Harry Vaughn, Deputy Warden, and
Herbert Parker, Deputy Warden, Baltimore City Jail, in their
individual and official capacities, Defendants
and
Merle J. Fitzgerald, individually and as Personnel and
Training Director and member of Evaluation Board, Baltimore
City Jail; Ronald Merritt, individually and as member of
Evaluation Board City Jail; and Calvin A. Lightfoot,
Warden, Appellants.
 No. 82-1376.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 16, 1985.
Decided Sept. 18, 1985.
 
 John S. Wood, Asst. City Sol., Baltimore, Md. (Benjamin L. Brown, City Sol., Elsie Jude Mason, Chief City Sol., Baltimore, Md., on brief), for appellants.
 Harold Buchman, Baltimore, Md., for appellees.
 Before WIDENER, HALL and WILKINSON, Circuit Judges.
 WILKINSON, Circuit Judge:
 
 
 1
 Timothy Wilton and Alfred Sullivan, correctional officers at the Baltimore City jail, sued Calvin Lightfoot (the jail warden), Merle Fitzgerald (the jail director of personnel), and Roland Merritt (the jail director of administrative services) under 42 U.S.C. Sec. 1983, charging in the complaint that the defendants had deprived Wilton and Sullivan of First Amendment rights "by using the Plaintiff's membership and activities in the union of Jail employees as a barrier to their promotion." After trial, jury verdict, and post-trial motions, the district court entered judgment in favor of each plaintiff for $525 in compensatory damages from Warden Lightfoot and for $325 in compensatory damages and $325 in punitive damages from Fitzgerald and also from Merritt.[1]
 
 
 2
 We reverse. The actions of defendants, as interpreted in the evidentiary light most favorable to plaintiffs, did not violate any constitutional rights enjoyed by Wilton and Sullivan. Defendants' concern that plaintiffs' past union activism would compromise their supervisory responsibilities over their former or fellow union members was, in the context of jail administration, entirely appropriate.
 
 
 3
 * Wilton and Sullivan joined the correctional staff in 1969 and 1972 respectively and were always prominent members of the union that represented employees at the city jail. Their activism was widely known, especially after they played leading roles in a controversial jail strike. As union representatives they also worked directly, in varying degrees of frequency and compatibility, with each of the defendants.
 
 
 4
 In January 1980, Wilton and Sullivan came before a jail promotion board to be considered for advancement to lieutenant. This board included defendants Merritt and Fitzgerald; Lightfoot did not sit on the board, but he had the authority to ignore the recommendations of the board and to promote whomever he chose. During the interviews of Wilton and Sullivan, one panelist asked the two applicants if they felt that they could serve effectively in the supervisory role of a lieutenant while continuing to remain active in union affairs. They answered that they had done so as sergeants and could continue to do so as lieutenants.[2]
 
 
 5
 After the promotion board did not recommend Wilton and Sullivan highly, the two men indicated to Fitzgerald that they believed that the process had been tainted by an improper anti-union inquiry. The question did violate Fitzgerald's internal office directive that proscribed such questions about union activities, but Fitzgerald saw no serious flaw in the interviews and refused to convene a new board. Wilton and Sullivan then proceeded through the chain of command to Warden Lightfoot, who agreed that the question suggested anti-union prejudice and accordingly ordered a new board to meet and prepare new recommendations.
 
 
 6
 The new board included three holdovers from the previous meeting: Merritt, Fitzgerald, and a corrections lieutenant. Merritt and Fitzgerald refused to recuse themselves, saying that their positions required them to participate in the promotion process; the evidence, however, shows that they did not sit on several other boards, and their asserted justification cannot stand on appeal. In the second board, as with the first, Merritt and Fitzgerald ranked Wilton and Sullivan at the bottom of the candidate list, and Lightfoot in turn did not promote either man.
 
 
 7
 Merritt, Fitzgerald, and Lightfoot reported that these decisions represented their honest evaluations of Wilton's and Sullivan's aptitude, job knowledge, organizational skills, interpersonal skills, motivation, maturity, stability, confidence, and leadership. Wilton and Sullivan contended to the contrary that their long and varied experience, outstanding records as corrections officers, and very high scores on the Civil Service examination indicated that they had been passed over because of their union affiliation. This impression was reinforced by the fact that their sometimes bitter management adversaries, Merritt and Fitzgerald, served on both boards and gave both men low marks. Wilton claimed that Merritt told him that "sometimes you have to just sit back and roll with the punches" of management and that Lightfoot told him that "if [Wilton and Sullivan] would just, in his words, cool out and delegate authority to other people, and not be in the limelight as far as the upper echelon administration [of the union], then [they] would pass through with flying colors." Sullivan alleged that Lightfoot remarked to him that "you are not doing anything wrong except your union involvement." According to Sullivan, Lightfoot expressed no concern about a possible lawsuit for any discriminatory action, promising that he would promote Wilton and Sullivan before the suit could accomplish any purpose.
 
 
 8
 Wilton and Sullivan did sue in May 1980, and Lightfoot did promote them both in May 1981. This action continued, however, on claims for back pay, retroactive seniority, and miscellaneous damages. Under plaintiffs' interpretation of the First Amendment, they would be entitled to these remedies if they proved that the defendants had considered Wilton's and Sullivan's union activism in the promotion decisions. Reading the evidence in the light most favorable to the plaintiffs, we agree that they have established the facts that they intended to demonstrate. But we disagree on the conclusions of law that are to be drawn from the situation.
 
 II
 
 9
 As this court noted in English v. Powell, 592 F.2d 727, 733 (4th Cir.1979), the relationship of the First Amendment to the organizational activities of public employees is an unsettled area of law. See generally omment, Labor Law--The Exclusivity Principle in the Public Employment Sector and First Amendment Rights, 23 N.Y.L.Sch.L.Rev. 132 (1977). The aspects relevant to this case, however, are clear. In York County Fire Fighters Association, Local 2498 v. County of York, Virginia, 589 F.2d 775 (4th Cir.1978), this court held that a locality "may validly prohibit supervisory personnel in the fire department from belonging to a union in which rank and file fire fighters of the department are members." Id. at 777. Adopting the reasoning of Elk Grove Firefighters, Local No. 2340 v. Willis, 400 F.Supp. 1097 (N.D.Ill.), aff'd, 539 F.2d 714 (7th Cir.1976), the court explained the fire fighters' situation in terms that apply as accurately to corrections officials like Wilton and Sullivan:
 
 
 10
 ... a first amendment right to associate may be validly limited where the limitation is necessary to a substantial and legitimate state interest. An efficient fire department is a legitimate and substantial state interest because of the need of fire fighters to act quickly and effectively to prevent loss of life and property, and the limitation on membership of supervisory personnel in a union of rank and file members is necessary in order to forestall a division of the supervisors' loyalties between the union and their employer.
 
 
 11
 York County Fire Fighters Ass'n v. County of York, 589 F.2d at 778. See also Atkins v. City of Charlotte, 296 F.Supp. 1068 (W.D.N.C.1969) (three-judge court).[3] This limitation on the public employees' asserted constitutional right of association is closely analogous to the recognized limitation on a public employee's First Amendment right to speak on matters of community concern. Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In each instance the prerogatives of a citizen must accommodate the obligations of an efficient worker.[4]
 
 
 12
 The efficient administration of local jails is of paramount importance. To the perennial problems of crowded cells, imperfect classifications, unsafe or unsanitary conditions, and prolonged periods of detainee inactivity, we decline to add a management structure badly compromised by conflicts of allegiances. Moreover, problems of turnover, absenteeism, favoritism or abuse of detainees are not unknown among jail employees. We need not stop to inquire whether such problems do or do not exist at the Baltimore City Jail, for jails generically are places where the government possesses a legitimate interest in "the proper discipline in the public service," and where "the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." Connick v. Myers, 461 U.S. at 151, 103 S.Ct. at 1692 (citation omitted).
 
 
 13
 York County Fire Fighters authorizes a government employer not only to ask of managerial candidates but also to answer for them the question that sparked so much controversy at the Wilton and Sullivan interviews, "Can you effectively wear two hats, that of a supervisor and a union representative?" The fact that this concern may have been bluntly or colloquially communicated to Wilton and Sullivan does not change the result. Nor can the bitterness of labor management relations, though regrettable, logically diminish the legitimacy of concerns over supervisor loyalty. Whether the prompt promotions of plaintiffs may have been a useful healing gesture at the jail is not for us to speculate. In deciding that the applicants could not serve both masters, Lightfoot, Merritt, and Fitzgerald reached the same conclusion for Wilton and Sullivan that York County reached for its entire firefighting force. In both instances the government employer's attention to conflicting tugs of allegiance did not violate any constitutional rights that may be enjoyed by the employees.
 
 
 14
 The judgment of the district court is accordingly
 
 
 15
 REVERSED.
 
 
 
 [1]
 In addition to Lightfoot, Merritt, and Fitzgerald, the original defendants included the remaining five members of the Baltimore City Jail Evaluation Board, six members of the Baltimore City Jail Board, two deputy wardens of the Baltimore City Jail, the Mayor of Baltimore, and the City Council. This appeal does not involve any of the various rulings that have effectively dismissed these other defendants from the case
 As a procedural matter, Wilton and Sullivan were correct to bring these claims directly to federal court. Extensive preemptive legislation requires many similarly situated employees to seek redress first in other forums. See Carter v. Kurzejeski, 706 F.2d 835 (8th Cir.1983) (First Amendment claim against federal employer); Buckley v. American Federation of Television and Radio Artists, 496 F.2d 305, 312-313 & n. 4 (2d Cir.), cert. denied, 419 U.S. 1093, 95 S.Ct. 688, 42 L.Ed.2d 687 (1974) (First Amendment claim against "private" employer). But courts have exercised their 28 U.S.C. Sec. 1343 jurisdiction in cases alleging interference by local government employers with public employees' organizational activities. See, e.g., McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir.1968); American Federation of State, County, and Municipal Employees, AFL-CIO v. Woodward, 406 F.2d 137 (8th Cir.1969).
 
 
 [2]
 Almost simultaneously with this exchange, the possibility of so direct a conflict of interest may have been reduced by the rearrangement of the Baltimore correctional officers' pattern of union representation. Until January 1980, the American Federation of State, County and Municipal Employees, Local # 44 represented lieutenants and all junior levels of jail personnel; the Managerial and Professional Society of Baltimore represented captains and all superior officers. The question and answer recounted in the above text suggest a shared belief that Wilton and Sullivan would confront this established structure if promoted to lieutenant. In fact, however, representation of lieutenants was transferred to the Classified Municipal Employees' Association four days before the interview. Wilton and Sullivan accordingly could not have been supervisors and also leaders of a nonsupervisory union
 Whatever the formal status of the institutions, the resolution of this case turns upon the actual assumptions and motivations of Lightfoot, Merritt, and Fitzgerald. In essence, plaintiffs argue that the defendants were motivated in disfavoring Wilton's and Sullivan's candidacies by the belief that the applicants could not commit their full allegiance to their employer in their intended future roles as lieutenants.
 
 
 [3]
 The York County analysis parallels--at the distance defined by 29 U.S.C. Sec. 152(2)--the interpretation of 29 U.S.C. Secs. 152(3), 152(11), and 164(a) in Beasley v. Food Fair of North Carolina, 416 U.S. 653, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974) (establishing that private employers need not treat supervisors identically to rank-and-file employees)
 
 
 [4]
 We do not think that York County can be fairly distinguished on the ground that the ordinance there involved disqualification of supervisors in a position of present union membership whereas here the concern is apparently that the partisanship of plaintiffs' past union activity and the intimacy of plaintiffs' past union associations would compromise their future effectiveness as supervisors. In either case, the legitimacy of the state's concern over the undivided loyalties of supervisors of local jails remains the same