214 F.3d 260 (2nd Cir. 2000)
 SCHNURMACHER NURSING HOME, Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner,
1199 NATIONAL HEALTH AND HUMAN SERVICE EMPLOYEES UNION, Intervenor.
 Docket Nos. 98-4388(L), 99-4012(XAP)
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: September 23, 1999
Decided: June 06, 2000
 
 Petition for review and cross petition for enforcement of an NLRB order that a nursing home bargain with two units of employees. We hold that fifteen "charge nurses" are supervisors within the meaning of Section 2(11) of the Labor Management Relations Act. We therefore modify the Board's order in part; enforce it in part, as modified; and deny enforcement in part. [Copyrighted Material Omitted]
 JAMES S. FRANK, Phillips Nizer Benjamin Krim & Ballon LLP (Steven M. Post, Adam Scott Blank, of counsel), New York, New York, for Petitioner-Cross-Respondent.
 DAVID A. FLEISCHER, Senior Attorney, National Labor Relations Board (Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, of counsel), Washington, D.C., for Respondent-Cross-Petitioner.
 KENT Y. HIROZAWA, Gladstein Reif & Meginniss, LLP (Yvonne L. Brown, of counsel), New York, New York, for Intervenor.
 Before: WINTER, Chief Judge, KEARSE, Circuit Judge, and MORDUE, District Judge.*
 WINTER, Chief Judge:
 
 
 1
 Schnurmacher Nursing Home ("SNH") petitions for review of an order by the National Labor Relations Board ("NLRB" or "Board") that SNH bargain with intervenor, 1199 National Health and Human Service Employees Union ("Union"), as the representative of two bargaining units of SNH employees. See Schnurmacher Nursing Home, 327 N.L.R.B. No. 56, 1998 WL 856131 (Nov. 30, 1998). The Board cross petitions for enforcement of the order.
 
 
 2
 We hold that the Board's determination that fifteen "charge nurses" employed by SNH are not statutory supervisors is not supported by substantial evidence. The charge nurses were, therefore, improperly included in two collective-bargaining units. We cannot be certain that the outcome of the election regarding the so-called "professional unit" would have been the same if the votes of the thirteen charge nurses had not been counted. We therefore deny enforcement to the Board's order insofar as it requires SNH to bargain with the Union as the professional unit's representative. The inclusion of two charge nurses in the so-called "residual unit's" balloting could not have affected the outcome, however. Accordingly, we enforce the order to bargain with the Union as to the residual unit, although the two charge nurses must be excluded from that unit.
 
 BACKGROUND
 
 3
 The facts are not seriously disputed. The battle is rather over the legal conclusions to be drawn from those facts.
 
 
 4
 SNH operates a skilled 245-bed nursing facility in White Plains, New York. The facility has six floors -- the second through sixth of which house patients -- and operates year-round, twenty-four hours a day in three shifts. Each patient floor is treated as a separate operational unit and contains approximately 50 beds and a nursing station.
 
 
 5
 An Administrator has primary responsibility for the facility's operation. The Director of Nursing reports to the Administrator and has overall responsibility for nursing care, and an Assistant Director of Nursing reports to the Director. Next in the hierarchy are approximately seven "nurse managers," who the parties agree are statutory supervisors. The nurse managers report directly to the Assistant Director of Nursing and handle the administration of the nursing department during the day shift. Except for one or two nights a week, there is only one nurse manager present during the other two shifts.
 
 
 6
 Reporting to the nurse managers are the fifteen charge nurses ("CNs"), thirteen of whom are registered nurses ("RNs") and two of whom are licensed practical nurses ("LPNs"). It is the CNs' status as statutory supervisors -- or lack of such status -- that is at issue. For each shift, one CN is assigned to each floor and is accompanied by another RN or LPN. Finally, certified nurse assistants ("CNAs") provide patient care throughout the facility.
 
 
 7
 A CN, together with the accompanying RN or LPN, is responsible for all patients on the assigned floor. CNs are therefore responsible for providing necessary patient care, including the administration of medicine and medical treatments, bathing, dressing, grooming, and other assistance with daily living. At the beginning of a shift, each CN completes a written daily assignment sheet, setting forth each CNA's patient and room assignments and break times. Each CNA has a regular patient room assignment from which there is rarely any deviation. If a CNA is absent, the CN must assign a substitute CNA, usually to the absent CNA's patients. If no substitute CNA is secured, the CN will divide the absent CNA's patients among the remaining CNAs.
 
 
 8
 During a shift, CNs assist CNAs with patient care. However, CNs also monitor each patient's overall care and often direct a CNA to administer a particular kind of care to a patient. The CNs also adjust the CNAs' assigned break times as patient needs dictate. In this regard, CNs often inform CNAs as to how to perform a particular task or direct CNAs to redo incorrectly performed tasks. On at least one occasion, a CN has received a written warning for failing properly to direct a CNA and delegate patient-care tasks. And on more than one occasion, a CN has been admonished for failing to assure the provision of necessary care for all patients in the assigned unit.
 
 
 9
 CNs also prepare written evaluations of CNAs, grading them and sometimes providing narrative comments on their work. The evaluation forms prompt the CNs to make recommendations for CNAs' development, but there is no evidence that any particular CN recommendation has ever impacted the wage, benefit, or job status of a CNA. There is also no evidence that a CN has ever formally disciplined a CNA. Rather, when a CN has become aware of CNA conduct that warrants discipline, the CN has reported the matter to the appropriate nurse manager.
 
 
 10
 On October 10, 1997, the Union petitioned the NLRB for elections in two units of SNH employees: the professional unit and the residual unit. SNH opposed the petition, claiming, inter alia, that thirteen CNs should be excluded from the professional unit and two from the residual unit because they were "supervisor[s]" under Section 2(11) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 152(11). The Acting Regional Director for Region 34 of the Board ("ARD") granted the Union's petition, ruling, inter alia, that the CNs were not supervisors within the meaning of Section 2(11) and were therefore properly included in the respective bargaining units.
 
 
 11
 SNH petitioned the NLRB for review of the ARD's decision. On January 8, 1998, while the petition was pending, the election was held, and the ballots were impounded pending the Board's decision on SNH's request for review. The Board denied SNH's petition and a subsequent request for reconsideration. The election results were majorities of 17 to 14 favoring the Union in the professional unit and 30 to 5 in the residual unit.
 
 
 12
 SNH thereafter refused to bargain with the Union in either unit, and the General Counsel issued an unfair labor practice complaint alleging refusals to bargain in violation of 29 U.S.C. §§ 158(a)(1) and (a)(5). On the General Counsel's motion for summary judgment before a three-member panel of the NLRB, SNH argued that, because the CNs are statutory supervisors, its refusal to bargain with the Union was lawful under Section 14(a) of the LMRA, 29 U.S.C. § 164(a). The NLRB, over a dissent by Member Brame, granted the General Counsel's motion and ordered SNH to bargain with the Union as the representative of the residual and professional units. See Schnurmacher Nursing Home, 1998 WL 856131, at *3-4. These petitions followed.
 
 DISCUSSION
 
 13
 If the CNs are supervisors, they have no right to bargain collectively with SNH. See 29 U.S.C. § 152(3) (providing that "[t]he term 'employee' . . . shall not include . . . any individual employed as a supervisor"); id. § 164(a) ("[N]o employer . . . shall be compelled to deem individuals defined . . . as supervisors as employees for the purpose of any law . . . relating to collective bargaining"); see also Beasley v. Food Fair, Inc., 416 U.S. 653, 659-60 (1974); NLRB v. Meenan Oil Co., 139 F.3d 311, 320 (2d Cir. 1998) ("Supervisors are not protected under the [National Labor Relations Act] and do not possess a right to bargain collectively.").
 
 
 14
 Section 2(11) of the LMRA defines "supervisor" as:
 
 
 15
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 16
 29 U.S.C. § 152(11). To determine whether an employee is a supervisor under this section, three questions must be addressed: (i) does the employee have the authority to exercise at least one of the twelve listed powers?; (ii) if so, does the employee exercise a listed power using "independent judgment"?; and (iii) does the employee exercise the power "in the interest of the employer"? See NLRB v. Health Care & Retirement Corp. of Am., 511 U.S. 571, 573-74 (1994) (hereinafter HCR). Each question must be answered in the affirmative if we are to deem the employee a supervisor under Section 2(11). See id.
 
 
 17
 Because HCR held that a nurse's authority to direct less-skilled employees is exercised "in the interest of the employer" rather than solely in the interests of patients, see id. at 579-80, the third requirement is not at issue. Thus, the questions before us are whether the CNs exercise any of the powers enumerated in Section 2(11) and, if so, whether they do so in the exercise of independent judgment.
 
 
 18
 The ARD specifically found that the CNs do not have the authority to hire, transfer, suspend, layoff, recall, promote, discharge, reward, adjust grievances, or effectively recommend such actions. The CNs do, according to the ARD, have the authority to assign CNAs, and "may" have the power to direct CNAs, but they exercise these powers either in a "routine" manner or without exercising independent judgment.
 
 
 19
 If supported by "substantial evidence," those findings must be upheld.[1] 29 U.S.C. § 160(e); see also id. § 160(f); Torrington Extend-A-Care Employee Ass'n v. NLRB, 17 F.3d 580, 590 (2d Cir. 1994). This familiar standard means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Torrington, 17 F.3d at 590 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)). We address the challenged findings in light of the entire record, including evidence that detracts from the ARD's determinations. See Universal Camera Corp., 340 U.S. at 488.
 
 
 20
 a) "Promote" and "Reward"
 
 
 21
 SNH argues that the CNs have the supervisory powers to promote and reward because they must make written evaluations of CNAs. However, there is no evidence that CNAs are promoted or rewarded based on the evaluations, and the evaluation forms do not include recommendations for pay raises, promotions, or other rewards. Moreover, the CNAs' salaries and all other terms of their employment are dictated by a collective-bargaining agreement. Accordingly, the ARD's finding that the CNs do not exercise the supervisory powers to "promote" and "reward" is based on substantial evidence. See Beverly Enters.--Penn., Inc. v. NLRB, 129 F.3d 1269, 1270-71 (D.C. Cir. 1997) (holding that CN evaluations did not manifest authority to "promote" and "reward" where CNAs' wages and benefits were governed by a collective-bargaining agreement); see also New York Univ. Med. Ctr. v. NLRB, 156 F.3d 405, 413 (2d Cir. 1998) ("Evaluations that do not affect job status of the evaluated person are inadequate to establish supervisory status."); Beverly Enters. v. NLRB, 148 F.3d 1042, 1047 (8th Cir. 1998) (CNs did not exercise power to "promote" and "reward" where "[t]heir evaluatory function was . . . primarily a reporting function"). We do note that the record might well support a finding that good CN evaluations reward CNAs in that they may be taken into account in future decisions by SNH on matters such as promotions. However, the Board was not required to draw that conclusion as a matter of law because the benefit of a good CN recommendation is somewhat speculative and perhaps contingent on other matters.
 
 
 22
 b) "Discipline" or "Effectively Recommend" Discipline
 
 
 23
 SNH next argues that CNs have the power to discipline CNAs. In support, SNH relies upon the CN job description, providing, among other duties, that a CN "counsels [and] disciplines staff." SNH also relies upon testimony that the nurse managers informed the CNs that they have the authority to discipline CNAs. The record does not show, however, that CNs ever exercised this authority in a particular case. In actual practice, the CNs appear not to have formally disciplined CNAs or even to have recommended discipline. Albeit, the CNs did, from time to time, refer CNA misconduct to a nurse manager but without recommendation. We uphold the Board's view that these referrals, by themselves, do not establish disciplinary authority as a matter of law. See Meenan Oil Co., 139 F.3d at 322 (reports of disciplinary problems containing no recommendation did not manifest dispatcher's supervisory status where "dispatcher is acting as a conduit for information and exercises no judgment in passing the knowledge along to management"). A different conclusion might be reached on de novo review, but the Board did not exceed its authority in taking its view of the issue. See New York Univ. Med. Ctr., 156 F.3d at 414 ("Theoretical or paper power does not a supervisor make."); see also Beverly Enters.--Mass., Inc. v. NLRB, 165 F.3d 960, 963 (D.C. Cir. 1999) ("[A]bsent exercise, there must be other affirmative indications of authority. Statements by management purporting to confer authority do not alone suffice.").
 
 
 24
 c) "Assign"
 
 
 25
 SNH argues that the undisputed and exercised -- on a daily basis -- authority of the CNs to assign CNAs to patients and to dictate the break times of each CNA on the floor establishes the CNs' supervisory status. But the ARD's finding that the exercise of this authority is merely routine and does not therefore require the "independent judgment" necessary to establish supervisory status is supported by substantial evidence.
 
 
 26
 CNAs are usually assigned to particular patients on a permanent basis, and it is generally unnecessary for CNs to do more than refer to prior practice in making assignments at the beginning of each shift. Moreover, when substitute CNAs are involved, they are usually assigned to the absent CNA's patients. When a substitute is not available, an absent CNA's patients are divided among other CNAs, an exercise of at least some discretion. In these circumstances, we cannot overturn the ARD's determination that the assignment power does not call for the exercise of independent judgment necessary to confer supervisory status, but is "of a merely routine or clerical nature." 29 U.S.C. § 152(11); Meenan Oil Co., 139 F.3d at 321 (dispatchers' assignment of drivers' routes and jobs did not require exercise of independent judgment where decisionmaking was "routine and clerical" and "governed by parameters"). Again, we might disagree on de novo review but uphold the finding on a deferential standard of review.
 
 
 27
 d) "Responsibly to Direct"
 
 
 28
 Although we need not reach the issue because of our disposition of this matter, we note that the CNs' responsibility to make written evaluations of CNAs, ostensible power to discipline CNAs, power to assign CNAs to patients, and responsibility to set CNAs' break times might well amount in the aggregate to the power "responsibly to direct" CNAs, particularly in light of the fact that each floor is a separate operational unit. In other words, while each such power when viewed in isolation might fall outside Section 2(11)'s definition, the aggregate may well amount to being in charge, i.e., having the power "responsibly to direct."
 
 
 29
 We pass this tempting conclusion, however, because the record establishes beyond question that CNs responsibly direct CNAs in other ways and exercise independent judgment in doing so. The ARD conceded that the "charge nurses may . . . direct the work of CNAs" but concluded -- seemingly more as a matter of rote than analysis -- that this responsibility is "routine in nature and does not require the exercise of independent judgment." These findings -- really naked assertions -- are unsustainable.
 
 
 30
 The record contains evidence of undisputed instances in which CNs had been disciplined for failing to direct staff properly in the provision of patient care. The ARD rather summarily concluded that these instances did "not establish that charge nurses responsibly direct [SNH] employees." As we stated in Spentonbush/Red Star Cos. v. NLRB, 106 F.3d 484 (2d Cir. 1997), however, accountability for another's failure to perform a duty establishes as a matter of law an employee's supervisory power responsibly to direct:
 
 
 31
 To be responsible is to be answerable for the discharge of a duty or obligation. In determining whether "direction" in any particular case is responsible, the focus is on whether the alleged supervisor is held fully accountable and responsible for the performance and work product of the employees he directs.
 
 
 32
 Id. at 490 (some internal quotation marks and all citations omitted).
 
 
 33
 In the most telling incident, a CN was given a written warning for "unacceptable performance" in connection with her failure to make a proper assessment of a patient's need for oxygen and to see that her staff administered the oxygen. In relevant part, the warning described the CN's duty and breach of that duty as follows:
 
 
 34
 [O]n or about June 24, 1997, the need arose to transfer a resident on your unit . . . well after your shift had begun. When the ambulance arrived, the attendants were informed that the patient had been in his current condition all day. However . . . there had been no directive from you to take any action regarding the patient's condition, and there was no sign that your assessment of this resident indicated any problems. If the resident was in a condition that required immediate medical attention (in this case, the administration of oxygen . . . ), it is your responsibility to make this assessment and to delegate the responsibility to your staff. Failure to do this endangered the resident and could have resulted in a much more serious medical condition.
 
 
 35
 As the charge nurse on your unit . . ., it is your responsibility to ensure that all residents under your care are taken care of
 
 
 36
 . . . .
 
 
 37
 You are expected to improve your performance . . . . Failure to do so . . . will result in further discipline, up to and including suspension and termination.
 
 
 38
 Employer Ex. 8 (emphasis added).
 
 
 39
 Another CN was advised in a written evaluation to "improve on techniques for directing staff and holding them responsible," clearly a comment on a failure to exercise supervisory power. In a third case, a CN was disciplined for neglecting a patient by allowing him to rest in a dangerous position. The reprimand stated that "[i]t is your responsibility to be aware of and supervise all residents/patients on your assigned unit." The reprimand stated that the CN "failed to do this with this resident" and warned that "[a]ny further like incident will result in more serious disciplinary action being taken." This reprimand was directed to the CN alone as the person in charge and assumed the CN's power to direct the CNAs.
 
 
 40
 In addition to these disciplinary incidents, the CNs' power to direct CNAs was corroborated by the unrebutted testimony of several CNs. For example, one gave the following testimony:
 
 
 41
 Q. Do you check up on the CNAs?
 
 
 42
 A. Yes, I do.
 
 
 43
 Q. And if you find something that's not right, do you tell them to fix it?
 
 
 44
 A. If something is not right, yes, I call them.
 
 
 45
 Q. And do they listen to you when you tell them to fix something?
 
 
 46
 A. If it's their duty, yes, to do it.
 
 
 47
 Q. And they do it when you tell them to do it, correct?
 
 
 48
 A. [T]hey have to do it. That's like the nurse manager tells me to do something and I do it.
 
 
 49
 Q. So the CNAs respond to your direction the same way you respond to the direction from the nurse manager[?]
 
 
 50
 A. Yes.
 
 
 51
 The ARD's finding that CNs do not responsibly direct CNAs cannot, therefore, be sustained. Indeed, having found that the CN's job description's outlining of tasks of a supervisory nature was not probative because of the lack of evidence of the exercise of such authority, the ARD could not reasonably ignore instances of the disciplining of CNs for the very failure to exercise it.
 
 
 52
 The record as a whole thus contains overwhelming evidence that the CNs both direct the CNAs and are held accountable for their performance. Accordingly, we conclude that the CNs exercise the supervisory power "responsibly to direct," 29 U.S.C. § 152(11), the CNAs and that the ARD's finding to the contrary was not supported by substantial evidence.
 
 
 53
 In rejecting SNH's claim that CNs responsibly direct CNAs, however, the ARD made an alternative finding that, even if the CNs do have the authority to direct the CNAs, the exercise of this authority is "routine in nature and does not require the exercise of independent judgment." This finding is also unsustainable.
 
 
 54
 Although the CNs often direct CNAs to perform routine tasks such as grooming, dressing, toileting, or making a patient's bed, the CNs direct the CNAs in far more substantial matters. As noted, an on-duty CN is responsible to direct her staff in providing all necessary patient care including the filling of critical and changing medical needs, such as the administration of oxygen in emergency and even life-threatening situations. The direction that the CNs give to CNAs in the provision of the latter type of care plainly requires the CNs to use independent judgment in assessing a patient's needs and a finding to the contrary cannot survive under any standard of review. See Spentonbush, 106 F.3d at 491 (overturning Board finding that tugboat captains were supervisors; "we are at a loss to understand how the grave responsibility for preventing [the mishandling of millions of gallons of gasoline] can be swept aside by the Board as routine and clerical"); Beverly Enters., Va., Inc. v. NLRB, 165 F.3d 290, 298 (4th Cir. 1999) (en banc) (holding charge nurses in Virginia nursing home were statutory supervisors; "[i]t strains credulity to imagine that . . . no judgments other than routine and clerical judgments are made [by the charge nurses] to keep the home operating").
 
 
 55
 In its cross-petition, the Board's General Counsel urges an alternative ground to uphold the ARD's finding that the CNs do not exercise the supervisory power to responsibly direct the CNAs. The argument is as follows: (i) in some cases, the Board has interpreted "independent judgment" to include "managerial judgment," but not "expert judgment"; (ii) following Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 842-43 (1984), we must defer to the Board's reasonable interpretation of the phrase "independent judgment"; (iii) even assuming the CNs here responsibly direct the CNAs, they do so while exercising expert judgment acquired through their professional training, not judgment exercised in pursuit of management prerogatives; and, therefore (iv) the CNs are not acting in a supervisory capacity when directing the CNAs in the provision of patient care.
 
 
 56
 The extent to which either the ARD or the Board relied upon the distinction between managerial judgment and expert judgment is unclear. However, given the record before us, we believe that such a distinction, even if a reasonable reading of the statute, would not save the ARD's findings.
 
 
 57
 It may be the case that one who makes a judgment as to the need for certain actions based on specialized knowledge and experience and exercises no further authority is not a statutory supervisor. But where the responsibility to make such a judgment and to see that others do what is required by that judgment are lodged in one person, that person is a quintessential statutory supervisor. For example, if one's responsibility for a particular patient is exhausted by indicating on a form a treatment program, the actual treatment being entirely the responsibility of others, it may be that one is not a supervisor. However, where one must both determine a treatment and ensure that others administer the treatment, it can hardly be said that supervisory authority is not being exercised.
 
 
 58
 The Board's expert judgment test might also legitimately serve to exclude from the definition of a supervisory relationship the familiar situation of less experienced employees deferring to the judgment of more experienced coworkers who do not purport to act on behalf of management. That is not the case with regard to the CNs, however. First, the disciplinary incidents indicate that the CNs have a duty to direct CNAs with regard to patient care, including changing medical needs, and might be discharged for failing to perform that duty. This relationship is of a character far different from that of more experienced workers showing the ropes to a new peer. Second, according CNs a separate title, assigning one to each floor, and providing a job description including the power to discipline shows that SNH has given them a formal management role. Indeed, it is the CN's supervisory authority over a floor at SNH that makes each floor a separate operational unit.
 
 
 59
 Moreover, if the Board's distinction between managerial and expert judgment excludes from the definition of supervisor more than those who exercise a specialized judgment without further responsibility or senior co-workers who provide advice to less-experienced peers, then it proves too much. Managerial power and expertise are often joined together for reasons too obvious to require further explanation, and any effort to treat them as mutually exclusive cannot be squared with the statute. Additionally, the exclusion of some responsibilities as "routine" and of others as "based on superior training and skills" is a lethal combination allowing the Board to narrow the definition of supervisor to a vanishing point. In the present case, the Board's brief strings together three consecutive paragraphs asserting that: (i) the CNs' assignment of CNAs to patients is not an exercise of supervisory authority because it is "routine in nature"; (ii) the CNs' direction of CNAs in meeting the variable health needs of patients is not supervisory because it is "based on . . . superior training and skills"; and (iii) the CNs' allocation of break times for CNAs is "routine." Under this approach, many quintessentially supervisory employees will in the Board's view always be exercising authority that does not constitute responsible direction or the exercise of independent judgment because it is either "routine" or "based on superior training and skills." This reasoning, of course, will ensure that few employees will in any particular case be found to meet the statutory definition of supervisor. Indeed, it was that approach that led the ARD to conclude that for most hours of the day at SNH, one nurse manager was the only direct supervisor regarding the care of 245 patients on five different floors.
 
 
 60
 We therefore hold that the CNs are supervisory employees.[2]
 
 
 61
 e) Remedy
 
 
 62
 The ARD included thirteen Registered Nurse CNs in the professional unit and two Licensed Practicing Nurse CNs in the residual unit. We cannot be certain that the outcome of the professional unit election would have been the same if the CNs' votes had not been tallied. The professional unit chose union representation by a margin of 17 to 14. Because 13 CNs were erroneously included in the professional unit and the ballots were commingled, we cannot know whether exclusion of the CNs from the professional unit would have altered the outcome of the election. We therefore deny enforcement of the Board's order insofar as it relates to the professional unit.
 
 
 63
 We need not, however, deny the NLRB's cross-petition for enforcement in its entirety. In the residual unit, 30 employees voted for the Union and only 5 against. Because exclusion of the two CNs from the residual unit election would not have affected the outcome, we enforce the Board's order as to the residual unit, albeit modified by the exclusion of the two CNs from that unit. See NLRB v. Meenan Oil Co., 139 F.3d 311, 319 (2d Cir. 1998) (upholding certification of union as representative of collective-bargaining unit even though Board erroneously included two confidential employees in unit because their exclusion would not have changed outcome of 25 to 18 majority for union).
 
 CONCLUSION
 
 64
 We modify the Board's order in part; enforce it in part, as modified; and deny enforcement in part. We modify the order by excluding the CNs (both RNs and LPNs) from both the professional and residual units. We therefore enforce the Board's order insofar as it relates to the residual unit, as modified by exclusion of the CNs from that unit, and deny enforcement to the Board's order with regard to the professional unit.[3]
 
 
 
 Notes:
 
 
 *
 The Honorable Norman A. Mordue, United States District Judge for the Northern District of New York, sitting by designation.
 
 
 [1]
 SNH argues that Spentonbush/Red Star Cos. v. NLRB, 106 F.3d 484, 492 (2d Cir. 1997), compels us to disregard the substantial evidence standard of review and instead accord only "diminished deference" to the Board's findings. We disagree. In Spentonbush, we undertook a "more probing" review of NLRB findings that tugboat and barge captains were not statutory supervisors because the Board's finding led to a facially "unconscionable result." Id. at 494. Where substantial evidence supports a finding, however, we must defer to that finding.
 
 
 [2]
 Some of the arguments advanced by the parties suggest that "charge nurse" is a term of art with a nationwide agreed-upon meaning and that our decision involves a significant dispute over an issue of law. However, our decision is based solely upon a factual record concerning SNH and does not purport to vest the title "charge nurse" with any legal significance detached from actual responsibilities similar to those entrusted to charge nurses at SNH.
 
 
 [3]
 SNH also argues that various other SNH employees were improperly included in the bargaining units. They include nursing staffing coordinator, materials management coordinator, one administrative assistant, two maintenance employees, and receptionists. Before the Board, however, SNH's only reference to these objections was a six-line footnote in its twenty-nine page response to the General Counsel's summary judgment motion: "In addition to opposing the GC's motion for summary judgment on the grounds set forth herein, SNH also disputes the [ARD's] other findings as set forth in SNH's Request for Review [of the ARD's decision in the representation proceeding] . . . ." Such a cryptic argument does not suffice to preserve these issues on a petition for review. See 29 U.S.C. 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure . . . to urge such objection shall be excused because of extraordinary circumstances."); Marshall Field & Co. v. NLRB, 318 U.S. 253, 255, 87 L. Ed. 744, 63 S. Ct. 585 (1943) (per curiam) ("[A] general objection [to 'each and every recommendation' of a trial examiner's report] did not apprise the Board that petitioner intended to press the question now presented . . . ."); NLRB v. Star Color Plate Svc., 843 F.2d 1507, 1510 n.3 (2d Cir. 1988) (raising issue in representation proceeding does not suffice to preserve it on review of order in related unfair labor practice proceeding).